UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                    )
UNITED STATES SECURITIES            )
AND EXCHANGE COMMISSION,            )
                                    )
           Plaintiff,               )
      v.                            )     Civil Action No. 1:18-cv-6718
                                    )
JOHN A. PAULSEN,                    )     Jury Trial Demanded
                                    )
           Defendant.               )
_____ )

# COMPLAINT

The United States Securities and Exchange Commission alleges as follows:

## Nature of the Action

1. This action concerns Defendant John A. Paulsen, a former analyst at a broker-dealer headquartered in Birmingham, Alabama ("Broker-Dealer"), who aided and abetted a pay-to-play scheme involving the New York State Common Retirement Fund (the "NYSCRF" or the "Fund"), Deborah D. Kelley, and Navnoor S. Kang.

2. From early 2014 until February 2016, Kang was the Director of Fixed Income and Head Portfolio Strategist of the NYSCRF, the third largest public pension fund in the United States, with investment responsibility for approximately $50 billion of the Fund's assets.

3. During the course of Kang's employment, Kang solicited and received improper gifts and entertainment from Kelley, a former registered representative at the Broker-Dealer. In exchange, Kang directed public pension trades to Kelley at the Broker-Dealer, and Kelley earned sizable commissions.

4. Paulsen and Kelley were colleagues at the Broker-Dealer. In February 2015, Paulsen and Kelley planned a ski trip in Park City, Utah for the purpose of entertaining Kang.

As part of the trip, Paulsen and Kelley incurred more than $11,000 in expenses entertaining Kang and Kang's girlfriend.

5.  Paulsen and Kelley sought reimbursement of those expenses from the Broker-Dealer, and intentionally hid the fact that Kang was on the trip by not including Kang's name on their expense reports.

6.  Later, when the Broker-Dealer discovered inconsistencies in the reports and began an internal investigation, Kelley and Paulsen conspired to lie, and did lie, to the Broker-Dealer's internal investigators about Kang's presence on the trip.

7.  Kang violated the antifraud provisions of the federal securities laws by directing Fund business to Kelley in exchange for gifts and entertainment, while failing to disclose his receipt of those improper benefits to the Fund. Kelley violated the antifraud provisions by providing the undisclosed benefits to Kang as part of the fraudulent *quid pro quo* scheme with Kang.

8.  Paulsen knowingly provided substantial assistance to Kelley and Kang by participating in the entertainment of Kang, then hiding his and Kelley's provision of benefits to Kang by submitting false expense reports, and lying to the internal investigators. Paulsen also facilitated Kang's and Kelley's *quid pro quo* scheme by allowing it to go undetected by the Broker-Dealer and the Fund. In doing so, Paulsen aided and abetted Kelley's and Kang's violations of Section 10(b) of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b) ], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), (a)(3)].

9.  Unless Paulsen is permanently restrained and enjoined, he will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint, and in acts,

2

practices, transactions, and courses of business of similar type and object.

## Jurisdiction and Venue

10.     The Commission brings this action pursuant to the authority conferred by Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], seeking to restrain and enjoin permanently Defendant from engaging in the acts, practices, transactions, and courses of business alleged herein.  The Commission also seeks a final judgment ordering Defendant to pay disgorgement, prejudgment interest, and civil penalties pursuant to Section 20(d) of the Securities Act [at U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

11.     This Court has jurisdiction over this action, and venue lies in this District, pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 20(d) and 27(a) of the Exchange Act [15 U.S.C.  §§ 78t(d) and 78aa(a)].  Defendant, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails in connection with the acts, practices, transactions, and courses of business alleged herein.  Some of the acts, practices, transactions, and courses of business at issue occurred in the Southern District of New York.

## Defendant

12.      **John A. Paulsen**, age 57, resides in Park Ridge, New Jersey.  From June 2013 through March 2015, Paulsen was a Managing Director at the Broker-Dealer.  Prior to that, Paulsen worked at a number of registered broker-dealers dating back to 1993.  From April 2015 through the present, Paulsen has been the Head of Research at a registered investment adviser based in Wilton, Connecticut.

**Other Relevant Persons**

13. **Navnoor S. Kang**, age 38, resides in Saratoga Springs, New York.  From January 2014 until his termination in February 2016, Kang was the Director of Fixed Income and Head Portfolio Strategist for the NYSCRF, a public pension fund managed by the New York State Comptroller.

14. **Deborah D. Kelley**, age 60, resides in Piedmont, California.  From January 2012 through August 2015, Kelley was a registered representative of the Broker-Dealer and its successor, a registered broker-dealer based in St. Louis, Missouri.

**The Facts**

15. Kelley met Kang while he was employed as a portfolio associate with a well-known asset management firm, and she had a business relationship with him for a period of time while he was working as a vice president and fixed income trader with another prominent asset management firm ("Asset Manager").

16. Paulsen first met Kang when he worked at the Asset Manager, and they had occasional business interactions.

17. At some point in or around 2012, Kang accepted an $8,000 Rolex watch from a registered representative of a broker-dealer, which Kang did not disclose to the Asset Manager.

18. In late 2012, an internal investigation by the Asset Manager into Kang's activities concluded that he had accepted Rolling Stones concert tickets valued at $1,200 from a registered representative of a broker-dealer doing business with the Asset Manager.

19. In addition, the investigation determined that Kang failed to report at least 54 additional instances where he received benefits and entertainment.  The Asset Manager terminated Kang in January 2013 for violations of its compliance and ethics policies based on his

4

improper receipt of, and failure to report, these benefits and entertainment. The Asset Manager informed Kang that he was being terminated for these reasons.

20. Between January 2013 and January 2014, Kang was unemployed and actively seeking work. Kelley remained in contact with Kang and assisted him in his job search – all in an effort to maintain and cultivate their business relationship.

### Kang's Employment By And Duties To The NYSCRF

21. In January 2014, the NYSCRF hired Kang as its Director of Fixed Income and Head Portfolio Strategist. During his job interview with the NYSCRF, Kang lied about the reason he was terminated by the Asset Manager. Kelley provided a reference to the NYSCRF on Kang's behalf.

22. As the Director of Fixed Income at the Fund, Kang made investment decisions, supervised seven investment officers, and was responsible for approximately $50 billion of the Fund's assets that were held in fixed-income securities.

23. Under New York State Law, the New York State Comptroller, and anyone to whom he or she delegates powers of investment, is a fiduciary of the Fund. Because Kang was delegated powers of investment by the Comptroller, he was a fiduciary to the Fund. As a fiduciary, Kang was required to act solely in the interests of the members and beneficiaries of the Fund, and was prohibited from receiving any consideration from any party other than the Office of the State Comptroller in connection with a transaction involving the Fund.

24. The NYSCRF maintains a "Code of Conduct" containing standards for the management of the Fund. The Code of Conduct applies to all employees of the Office of the State Comptroller who have responsibility for matters relating to the Fund. Among other things, the Code of Conduct mandates that the Fund shall "be managed in accordance with the highest

ethical, professional and conflict of interest standards," and actions on behalf of the Fund "shall be for the sole benefit of the Retirement System's members, retirees and beneficiaries."

25. Kang received training on the Fund's policies and codes, as well as applicable New York State Law, and certified as to his understanding of the prohibitions contained therein regarding the receipt of gifts, meals, travel, and entertainment.

26. Kang had an affirmative and continuing duty to disclose to the Fund his solicitation and acceptance of travel, entertainment, and benefits. Kang was required to report the receipt of anything more than nominal value from interested parties.

27. During his tenure with the Fund, Kang made no such disclosures. Furthermore, Kang filed a certification with the Fund in which he represented that he had received no gifts in excess of $1000. This certification was false.

28. Shortly after Kang joined the Fund, Paulsen and Kang had an in-person meeting. At the meeting, Kang told Paulsen that the Fund had very strict rules which prohibited him from accepting anything from Paulsen.

**Kelley Corruptly Provides Kang With Undisclosed Gifts And Entertainment**

29. Kelley provided thousands of dollars' worth of benefits and entertainment to Kang in exchange for access to NYSCRF business, despite the fact that her colleagues had warned her to avoid such behavior.

30. Specifically, in a February 6, 2014 email (immediately prior to Kelley beginning her coverage of the NYSCRF account), another registered representative at the Broker-Dealer told Kelley to "remember these guys cannot be entertained as they are a state fund."

31. Nevertheless, Kelley soon thereafter planned a trip to New Orleans for herself, her husband, Kang, and Kang's girlfriend, which took place in October 2014.

32. On this trip, Kelley spent, and then expensed to the Broker-Dealer, more than $8,000 for the four of them on meals, drinks, and entertainment, including $6,000 for four VIP tickets to a Paul McCartney concert.

33. Kelley intentionally omitted the names of Kang and his girlfriend from her expense reports. Instead, she falsely reported that clients from a private firm had attended the trip.

### Paulsen And Kelley Corruptly Provide Kang And His Girlfriend With Undisclosed Gifts And Entertainment On A Ski Trip

34. On November 6, 2014, Kang called Paulsen and raised the idea of a ski trip. Paulsen mentioned the idea to Kelley, and Kelley then planned a ski trip to Park City, Utah, which took place in February 2015.

35. The ski trip was originally scheduled to begin on Thursday, February 12, 2015, with Paulsen, Kelley, Kelley's husband, Kang, and Kang's girlfriend attending. Kelley and Paulsen learned prior to the trip that Kang and his girlfriend would not arrive in Park City until Friday, February 13. Paulsen asked Kelley via Bloomberg instant message whether they should adjust their arrival date "or just keep it :-)." Kelley replied, "I'm still coming in Thurs :-)."

36. Between them, Kelley and Paulsen spent and expensed more than $11,000 for skiing, hotel rooms, dinners, and drinks. These expenses included the costs of limousine service, two lunches, two dinners, ski rentals, ski lessons, and three nights at the Hotel Park City (at more than $1,100 per night) for Kang and his girlfriend.

### Paulsen And Kelley Submit False Expense Reports To The Broker-Dealer

37. After the trip, Paulsen and Kelley discussed how they would handle Kang's attendance on the ski trip when they submitted their expense reports. Kelley told Paulsen that Kang's name, and Kang's girlfriend's name, could not appear on their expense reports. Paulsen

7

and Kelley agreed that they would keep Kang's attendance on the trip a secret. Paulsen understood Kelley would not mention Kang or his girlfriend on her expense reports. Paulsen planned to do the same thing.

38. Kelley submitted false expense reports to the Broker-Dealer. On her expense reports, she concealed from the Broker-Dealer the fact that Kang and his girlfriend were on the trip, listing other customers and personal acquaintances – none of whom were in Park City at the time.

39. Paulsen also submitted false expense reports. On February 19, 2015, Paulsen requested reimbursement from the Broker-Dealer for a $363 dinner that occurred on Thursday, February 12, 2015, prior to Kang's arrival in Park City. On his expense report, Paulsen represented that five people attended the dinner: Paulsen, Kelley, Kelley's husband, and two employees of a prominent asset management firm, a client of the Broker-Dealer. In fact, these two individuals were not at the dinner, nor were they even in Park City at the time.

40. Paulsen knew that, at the time he submitted the expense report, the Broker-Dealer would not ask questions if he listed client guests on the report. Paulsen also knew that he needed to justify his and Kelley's presence in Park City, because the real reason they were there – to entertain Kang – could not be disclosed.

41. Paulsen also requested reimbursement from the Broker-Dealer for a $125 lunch that occurred on February 14, 2015. On his expense report, he represented that the guests were himself, Kelley, Kelley's husband, and an analyst at an investment advisory firm. In truth, the analyst was neither at the lunch nor in Park City at the time. The actual lunch receipt from the restaurant indicated that five guests attended the lunch. The other two guests were Kang and his girlfriend. Paulsen intentionally omitted Kang's name from his expense report because he knew,

8

and had previously discussed and agreed with Kelley, that Kang could not be mentioned on his expense reports.

42. When he submitted his expense report, Paulsen attached a printout of an email exchange he had on February 25, 2015 (after the trip) with the Broker-Dealer's Head of Fixed Income Sales (and Kelley's supervisor). In the email exchange, Paulsen asked the Head of Fixed Income Sales to confirm, in writing, his preapproval of Paulsen's February 2015 client trip (which included the ski trip). Paulsen listed six customers that he saw during the trip. The email did not mention Kang or the Fund.

43. On February 26, 2015, Kelley and Paulsen engaged in the following conversation via Bloomberg instant message:

> DK: Lose[sic] lips sink ships! No talky re ski trip si vous plait
>
> JP: I have not said anything
>
> DK: Allen says he heard about it from you and that we were with Nav and "gorgeous" gf
>
> JP: I mentioned to Allen yes. sorry
>
> JP: Told him to stay quiet. He was talking about the energy trade you did yesterday
>
> DK: ah - xoxo - just need to be SO careful
>
> JP: I know.
>
> DK: let's not mention to anyone else - AR, AO, and JW know.
>
> JP: ok
>
> JP: I put my expenses in and did not mention them
>
> . . .
>
> JP: for the [February 12] dinner at Mustang I put down Yuri and Del Anderson
>
> JP: is that ok?

9

   DK: perf

44. Kang did not disclose his receipt of any of these meals, travel, or entertainment to the NYSCRF.

## **Kang Corruptly Rewards Kelley With Lucrative Bond Trading Business**

45. In exchange for these benefits, Kang steered lucrative NYSCRF bond trading business to the Broker-Dealer, resulting in substantial personal gain for Kelley.

46. When Kang first arrived at the NYSCRF, there were a very small number of brokers approved to execute fixed income trades directly for the Fund.

47. Kang set out to expand the list of approved brokers under the guise of facilitating additional liquidity and obtaining best execution.

48. On June 10, 2014, at Kang's direction, the Fund initiated a fixed income broker search to select brokers for its internally managed assets. Interested entities were required to submit applications, which were then reviewed internally by a group led by Kang.

49. Kelley submitted an application on behalf of the Broker-Dealer.

50. Several months later, on November 6, 2014, the same date Kang called Paulsen to suggest the ski trip, Kang sent a memorandum to the NYSCRF's CIO recommending that eight brokers be added to the approved list. The recommended brokers included the Broker-Dealer, and all eight brokers were approved.

51. Although Kang indicated in his memorandum that the eight brokers would be required to submit to a "full due diligence process" conducted by an outside firm, no such process ever took place. Accordingly, the eight brokers were approved based solely on the recommendation contained in Kang's November 6, 2014 memorandum.

52. Prior to the Broker-Dealer becoming an approved broker, Kang was directing trades to the Broker-Dealer through one of the Fund's approved brokers ("Approved Broker-

10

Dealer").

53. By using the Approved Broker-Dealer, Kang circumvented the Fund's policy of only using approved brokers, thus allowing Kang to steer Fund business and commissions to Kelley's firm even before Kang was able to engineer the placement of the firm on the Fund's approved broker list.

54. Kelley provided substantial personal benefits to Kang beginning shortly after the Fund solicited applications for additional brokers, as the timeline below illustrates:

| Date | Event |
| --- | --- |
| June 10, 2014 | NYSCRF solicits applications for brokers via email. |
| August 15, 2014 | In an instant Bloomberg message between Kang and Kelley, Kang says he would like to see a Paul McCartney concert but "might have to sell a car to get [tickets]." Kang says he wants to see the concert in New Orleans. Kelley responds, "I'm in." |
| August 19, 2014 | Kelley purchases four Paul McCartney tickets at a price of $6,005. |
| October 9-13, 2014 | Kelley and her husband spend a weekend in New Orleans with Kang and Kang's girlfriend. Kelley expenses more than $8,000 in meals and entertainment. |
| November 6, 2014 | In a memorandum to CIO of NYSCRF, Kang recommends the Broker-Dealer, Kelley's firm. |
| November 6, 2014 | Kang calls Paulsen at the Broker-Dealer and mentions going on a ski trip. |
| February 13-16, 2015 | Park City ski trip takes place. Paulsen and Kelley expense more than $11,000 in meals, hotel rooms, ski equipment and rentals, limousine service, and entertainment. |

55. Over the approximately two years that Kang worked at the NYSCRF, he directed a significant amount of trading to the Broker-Dealer, resulting in substantial personal gain for Kelley.

11

**Paulsen, Kelley, And Kang Continue Their Attempts To Keep The Scheme A Secret**

56. At the end of March 2015, Paulsen left the Broker-Dealer to take a job at an investment adviser firm. Shortly thereafter, the Broker-Dealer's in-house counsel contacted Paulsen as part of its internal investigation into Kelley's entertainment of Kang. Paulsen was asked to consent to an interview by the Broker-Dealer's outside counsel, and he agreed to do so.

57. Shortly thereafter, Paulsen called Kelley and asked if she knew the purpose of the internal investigation. Kelley said that she believed the Broker-Dealer was looking into the ski trip, and that the Broker-Dealer's outside counsel had also scheduled an interview with her. Paulsen told Kelley that he would delay his interview until after Kelley's so that they could speak again after Kelley's interview and align their stories.

58. The Broker-Dealer's outside counsel interviewed Kelley on April 29, 2015. During the interview, Kelley repeatedly lied about Kang's participation in the ski trip and her paying for Kang's expenses.

59. After Kelley's interview, Kelley told Paulsen what she had been asked, and what she had said. Paulsen agreed with Kelley to tell the Broker-Dealer's outside counsel a story consistent with Kelley's – in other words, Paulsen agreed to lie during his interview.

60. When the Broker-Dealer's outside counsel asked Paulsen about the February 14, 2015 lunch, Paulsen attempted to line up his account of what happened with what Kelley had told the investigators. Paulsen said that the investment analyst that he previously identified was not present at the lunch. Instead, Paulsen claimed (as had Kelley) that some of Kelley's friends joined them when, in fact, Kang and his girlfriend were there.

61. Paulsen told other lies during the interview to attempt to corroborate Kelley's false account. Paulsen falsely told the Broker-Dealer's outside counsel that, while Kang was in

Park City during the weekend of the ski trip, he was there on his own and did not go out with Paulsen and Kelley. Paulsen also said that Kang was not staying at the same hotel as Kelley, when, in fact, Paulsen knew that Kang and Kelley stayed at the same hotel. Paulsen also said that he saw Kang for the first time in Park City on February 15, 2015, when in fact Paulsen, Kelley, and Kelley's husband had had lunch and dinner with Kang and his girlfriend the previous day.

62. During the interview, Paulsen also said that Kang paid for food and drinks for the group after skiing on February 15, 2015. While Paulsen claimed that he did not remember why Kang insisted on paying, he posited that maybe Kelley had paid for something earlier in the day and Kang needed to offset it. This was the false narrative that Paulsen and Kelley had agreed to tell the investigators. In fact, Kang did not pay for food and drinks, and the concept of Kang attempting to repay Kelley was a fabrication.

63. Paulsen then said that he had dinner that night with Kelley, Kelley's husband, and Kelley's two friends. This was another part of the false narrative that Paulsen and Kelley conspired to tell the investigators. In fact, Kang and his girlfriend were at that dinner; Kelley's friends were not.

64. At the end of his interview, Paulsen lied again, saying that he never witnessed Kang being entertained on the ski trip.

65. On August 10, 2015, the Broker-Dealer terminated Kelley and, on February 22, 2016, the NYSCRF terminated Kang.

66. On May 30, 2017, based in part on the conduct described in this Complaint, Kelley pleaded guilty to conspiracy to commit securities fraud and conspiracy to commit honest services wire fraud, each of which Kelley committed while she was a registered representative of

13

the Broker-Dealer and its successor. *United States v. Kelley*, 16-CR-837 (S.D.N.Y.). Kelley was sentenced to three years' probation, with 6 months' home confinement and one thousand hours of community service, and was ordered to pay a $50,000 fine and $242,724.17 in restitution to the NYSCRF.

67. On November 8, 2017, based in part on the conduct described herein, Kang pleaded guilty to conspiracy to commit securities fraud and conspiracy to commit honest services wire fraud in the matter of *United States v. Kang*, 16-CR-837 (S.D.N.Y.). Kang was sentenced to 21 months' imprisonment and three years' supervised release, and ordered to pay $242,724.17 in restitution to the NYSCRF and to forfeit $78,716.00.

## Claims for Relief

### Count I

*Aiding and Abetting Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act*

68. The Commission realleges and incorporates by reference paragraphs 1 through 67 as if fully set forth herein.

69. Kelley, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently: (a) employed devices, schemes, or artifices to defraud; and/or (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

70. Defendant Paulsen knowingly or recklessly provided substantial assistance to Kelley in her violation of Sections 17(a)(1) and 17(a)(3) of the Securities Act.

71. By engaging in the conduct described above, Defendant Paulsen aided and abetted violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

### Count II

### *Aiding and Abetting Violations of Sections 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Thereunder*

72. The Commission realleges and incorporates by reference paragraphs 1 through 67 as if fully set forth herein.

73. Kelley, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the mails, directly or indirectly, acting intentionally, knowingly, or recklessly: (a) used or employed devices, schemes, or artifices to defraud; and/or (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon other persons, including current and prospective purchasers of securities.

74. Defendant Paulsen knowingly or recklessly provided substantial assistance to Kelley in her violation of Sections 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder.

75. By engaging in the conduct described above, Defendant Paulsen aided and abetted violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### Count III

### *Aiding and Abetting Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act*

76. The Commission realleges and incorporates by reference paragraphs 1 through 67 as if fully set forth herein.

15

77. Kang, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently: (a) employed devices, schemes, or artifices to defraud; and/or (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

78. Defendant Paulsen knowingly or recklessly provided substantial assistance to Kang in his violation of Sections 17(a)(1) and 17(a)(3) of the Securities Act.

79. By engaging in the conduct described above, Defendant Paulsen aided and abetted violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

## Count IV

### *Aiding and Abetting Violations of Sections 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

80. The Commission realleges and incorporates by reference paragraphs 1 through 67 as if fully set forth herein.

81. Kang, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the mails, directly or indirectly, acting intentionally, knowingly, or recklessly: (a) used or employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon other persons, including current and prospective purchasers of securities.

82. Defendant Paulsen knowingly or recklessly provided substantial assistance to Kang in his violation of Sections 10(b) of the Exchange Act and Rule 10b-5 thereunder.

83. By engaging in the conduct described above, Defendant Paulsen aided and abetted violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b].

## **Prayer for Relief**

**WHEREFORE,** the Commission respectfully requests that the Court:

### I.

Permanently enjoin Defendant from violating or aiding and abetting violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

### II.

Order Defendant to disgorge the ill-gotten gains they received from the violations alleged herein, including prejudgment interest thereon;

### III.

Order Defendant to pay civil penalties pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)]; and

### IV.

Grant such other and further relief as the Court deems just and proper.

## **Jury Demand**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury on all issues so triable.

Date:   July 26, 2018                              Respectfully submitted,

                                                UNITED STATES SECURITIES AND
                                                EXCHANGE COMMISSION

                                                /s/ Alyssa A. Qualls
                                                Alyssa A. Qualls (AQ-4247)
                                                John E. Birkenheier, Illinois Bar No. 6270993
                                                Brian D. Fagel, Illinois Bar No. 6224886
                                                Eric A. Celauro, Illinois Bar No. 6274684
                                                Attorneys for Plaintiff
                                                U.S. Securities and Exchange Commission
                                                  Chicago Regional Office
                                                175 West Jackson Blvd., Suite 1400
                                                Chicago, Illinois 60604
                                                (312) 353-7390
                                                (312) 353-7398 (facsimile)
                                                QuallsA@sec.gov
                                                BirkenheierJ@sec.gov
                                                FagelB@sec.gov
                                                CelauroE@sec.gov