UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                Plaintiff,

         v.

JOHN A. PAULSEN,

                Defendant.

**ORDER**

18 Civ. 6718 (PGG)

---

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Securities and Exchange Commission (the "SEC") brings this civil enforcement action against Defendant John Paulsen for aiding and abetting violations of securities law. The SEC has moved for summary judgment. (Dkt. No. 72) For the reasons stated below, the SEC's motion will be denied.

## **BACKGROUND**[1]

### I.    FACTS

        Defendant Paulsen and Deborah Kelly worked at Sterne Agee, a broker-dealer located in Birmingham, Alabama. Paulsen was employed at the firm between June 2013 and March 2015, while Kelley worked there from January 2012 to August 2015. (Pltf. R. 56.1 Stmt.

---

[1] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)). Where Paulsen disputes the SEC's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Paulsen's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by the Court are undisputed.

(Dkt. No. 73) ¶¶ 2, 5)  Paulsen was a managing director and research analyst at the firm, and Kelley was a registered sales representative.  (Id. ¶¶ 2, 5, 38)

From early 2014 to February 2016, Navnoor Kang was the Director of Fixed Income and Head Portfolio Strategist for the New York State Common Retirement Fund (the "Fund"), which is the third largest public pension fund in the United States.  (Id. ¶¶ 6, 10-12)  The Fund prohibited Kang from accepting gifts, meals, travel, or entertainment valued at more than $15.  (Id. ¶¶ 20-22)  Kang informed Paulsen of this restriction in early 2014.  (Id. ¶¶ 26-27)

In 2009, while working at another broker-dealer, Kelley had organized a successful ski trip for the firm's clients.  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 208)  In 2012, she attended a ski trip organized by an industry vendor, which Kang also attended.  (Id. ¶ 206)  In 2012 and 2013, while at Sterne Agee, Kelley tried unsuccessfully to organize a ski trip for firm clients.  (Id. ¶ 207)

In February 2014, Paulsen and Kang discussed the idea "of spending a day together skiing in Windham, New York, where Paulsen had a ski cabin."  (Id. ¶ 211)  Windham was "a day trip for [Kang,]" who worked in Albany. (Id. ¶¶ 170, 212)

On June 10, 2014, Kang initiated a review at the Fund as to what fixed income broker-dealers should be allowed to execute trades for the Fund.  (Pltf. R. 56.1 Stmt. (Dkt. No. 73) ¶ 92)  Sterne Agee was not then an approved broker for the Fund, and Kelley submitted an application to the Fund to have Sterne Agee designated as an approved broker.  (Id. ¶¶ 91, 94)

In October 2014, Kelley proposed a client ski trip to her supervisor, Jon Walker – who was head of Fixed Income Sales at Sterne Agee – and to Andrew Rochat, head of Sterne Agee's Investment-Grade Corporate Bond Trading Desk.  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 208)

In a November 6, 2014 text message to Kelley, Paulsen mentioned his February 2014 conversation with Kang, in which the two had discussed a ski trip to Windham, New York. Paulsen wrote, "[n]eed to do that." (Pltf. R. 56.1 Stmt. (Dkt. No. 73) ¶¶ 53-54) Kelley replied "that she was 'IN!' and suggested Park City[, Utah]" as the destination. (Id. ¶ 56 (emphasis in original)) Kelley also told Paulsen to "'pick a date' and she 'will make it happen.'" (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 214) Kelley later told Paulsen that she was planning a trip to Park City "for a large number of clients." (Id. ¶ 215)

That same day, Kang recommended to the Fund's Chief Investment Officer that Sterne Agee and seven other broker-dealers be added to the Fund's approved list for broker-dealers. Kang's request was approved the same day. (Pltf. R. 56.1 Stmt. (Dkt. No. 73) ¶¶ 95-96)

Paulsen denies knowing that (1) Sterne Agee was not already a Fund-approved broker-dealer; (2) Kang had initiated a review of the approved broker-dealer list at the Fund; (3) Kelley and Sterne Agee had applied to join the approved list; or (4) the Fund had approved that request. (Def. R. 56.1 Cntrstmt. (Dkt. No. 86) ¶¶ 91-95)

Jon Walker, Kelley's supervisor, approved the Park City ski trip. (Pltf. R. 56.1 Stmt. (Dkt. No. 73) ¶¶ 61-62) Paulsen confirmed with Walker that he could attend even though, as it turned out, only one client representative – Kang – was going. (Id. ¶ 63)

On February 12, 2015, Paulsen, Kelley, Kelley's husband, Kang, and Kang's girlfriend arrived in Park City for the ski trip, which took place over three days and nights. (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 246, 250-51) Paulsen was present at several joint meals at which Kelley paid for Kang and his girlfriend (Pltf. R. 56.1 Stmt. (Dkt. No. 73) ¶ 65), and Paulsen himself paid for a $125 lunch that he attended with Kelley, Kelley's husband, Kang, and Kang's girlfriend on February 14, 2015. (Id. ¶ 67) Kelley and Paulsen spent $11,000 in total on the ski

3

trip, most of which was expensed by Kelley, who purchased ski rentals, lessons, a hotel room – for three nights at $1,100 per night – meals, and a limousine service for Kang and his girlfriend. Paulsen denies knowing how much money Kelley spent on Kang and his girlfriend. (Id. ¶¶ 66-69; Def. R. 56.1 Cntrstmt. (Dkt. No. 86) ¶¶ 66-69)

After Kelley and Paulsen returned to work, Kelley told Paulsen not to list Kang or Kang's girlfriend on his expense report. Paulsen understood that Kelley wanted these names omitted from Paulsen's expense report because Kang "was not supposed to be accepting entertainment [from Sterne Agee employees]." (Pltf. R. 56.1 Stmt. (Dkt. No. 73) ¶¶ 70, 82-83)

Paulsen's expense report reflects a February 14, 2015 lunch costing approximately $125, and a February 12, 2015 dinner costing $363.[2] (Id. ¶¶ 71-72, 75) As to the lunch, Paulsen's expense report states that it was attended by Paulsen, Kelley, Kelley's husband, and an analyst from another firm. In reality, the attendees were Paulsen, Kang, Kang's girlfriend, Kelley and her husband. (Id. ¶¶ 75-79) "Paulsen knew that the reason Kang's name should not appear on the expense report is that Kang 'was not supposed to be accepting entertainment.'"[3] (Id. ¶ 83) Kang, for his part, did not disclose to the Fund that Sterne Agee employees had provided him and his girlfriend with meals, travel, and entertainment. (Id. ¶ 90)

On February 26, 2015, Kelley instant messaged Paulsen, reminding him not to tell anyone at the firm about the trip: "L[o]ose lips sink ships! No talky re ski trip si vous plait." (Id. ¶ 88) Kelley told Paulsen that another broker at their firm, Allen Oppici, had heard that Kelley and Paulsen were in Park City with Kang and his girlfriend. (Id.) Paulsen apologized to

---

[2] The dinner occurred before Kang and his girlfriend arrived. (Id.)
[3] Paulsen also misrepresented who had attended the dinner. His expense report lists Paulsen, Kelley, Kelley's husband, and two asset manager clients as attendees, when in fact the asset manager clients did not attend. (Id. ¶ 73)

4

Kelley for telling Oppici about the trip, and said that he had told Oppici to "stay quiet." (Id.) He also reported that Oppici "was talking about the energy trade you did yesterday." (Id.) Kelley told Paulsen that they "need to be SO careful," and Paulsen replied, "I know." (Id. (emphasis in original))

Paulsen then told Kelley, "I put in my expenses and did not mention them[,]" which could reasonably be understood to refer to Kang and his girlfriend. (Id.) Paulsen also wrote that "for the [February 12, 2015] dinner at Mustang I put down Yuri and Del Anderson, is that ok?"[4]  Kelley replied, "perf." (Id.)

Oppici "testified that he does not recall Paulsen telling him to 'stay quiet' about the ski trip, and does not recall any sensitivity about discussing the ski trip." (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 276)

The energy trade that Paulsen had referenced in his instant message with Kelley occurred on February 25, 2015, and earned Kelley a commission of $11,521. Kang had directed the trade to Kelley, although Paulsen denies that he knew this at the time. (Pltf. R. 56.1 Stmt. (Dkt. No. 73) ¶¶ 99-100; Def. R. 56.1 Cntrstmt. (Dkt. No. 86) ¶ 98)

In March 2015, Paulsen left Sterne Agee. (Pltf. R. 56.1 Stmt. (Dkt. No. 73) ¶ 102) Shortly thereafter, Sterne Agee began to investigate Kelley's entertainment of Kang, and the law firm conducting the investigation asked to interview Paulsen. He agreed. (Id. ¶¶ 103-04) Paulsen then contacted Kelley and asked if she knew the purpose of the interview. (Id. ¶ 105) Kelley told Paulsen that the firm was investigating the ski trip with Kang, and that she had also been scheduled for an interview. (Id. ¶ 106) Paulsen and Kelley agreed that he would delay his

---

[4] Del Anderson is an analyst at PIMCO, and "Yuri" refers to Yuri Garbuzov, a portfolio manager at PIMCO. Neither Anderson nor Garbuzov attended the dinner. (Paulsen Dep. Tr. (Dkt. No. 80-8) at 110:4-25)

5

interview until after Kelley's interview had taken place, so that Paulsen could learn what Kelley had been asked. (Id. ¶ 107)

Kelley was interviewed on April 29, 2015, and lied about Kang's participation in the Park City ski trip and her and Paulsen's payment of Kang's expenses. (Id. ¶ 108) After her interview, Kelley told Paulsen what she had been asked and what she had said. Paulsen agreed to provide the same false story to the investigators. (Id. ¶¶ 109-10)

At his interview, Paulsen told the investigators that Kelley's friends had attended the lunch and dinner that he had expensed; that Kang had been in Park City that weekend but was there independently; that Kang had stayed at a different hotel; and that Kang had once paid for a meal for the group but that Paulsen thought it might be to offset something for which Kelley had paid earlier. (Id. ¶¶ 112-21) Paulsen also did not reveal to the investigators that Walker was aware that Kang would be attending the ski trip. (Id. ¶ 122)

Sterne Agee fired Kelley on August 10, 2015, and the Fund fired Kang on February 22, 2016. (Id. ¶¶ 123-24)

In 2017, Kelley and Kang pleaded guilty to conspiracy to commit honest services wire fraud and conspiracy to commit securities fraud. (Id. ¶¶ 127, 131) As to the securities law violation, Kelley and Kang admitted to conspiring to violate 17 C.F.R. § 240.10b-5 ("Rule 10b-5") and 15 U.S.C. §§ 78j(b) and 78ff, which prohibit

> (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of [15 U.S.C. §§ 78j(b) and 78ff].

(Indictment (Dkt. No. 73-36) (Count One); Superseding Information (Dkt. No. 73-38) (Count One))

6

In Kelley's plea allocution, she admitted that she had paid for Kang's expenses on the ski trip in order to obtain Fund business, and that she knew that her conduct was wrongful and violated Sterne Agee's rules and the Fund's rules. (Pltf. R. 56.1 Stmt. (Dkt. No. 73) ¶ 132) In Kang's plea allocution, he admitted knowing that Kelley's payment of his expenses on the ski trip was in exchange for steering Fund business to Sterne Agee. (Id. ¶ 128; see also Def. R. 56.1 Cntrstmt. (Dkt. No. 86) ¶ 128)

## II. PROCEDURAL HISTORY

The Complaint was filed on July 27, 2018. (Dkt. No. 1) Count One alleges that Paulsen aided and abetted Kelley's violations of §§ 17(a)(1) and 17(a)(3) of the Securities Act; Count Two alleges that Paulsen aided and abetted Kelley's violations of Section § 10(b) of the Securities Exchange Act and Rule 10b-5; Count Three alleges that Paulsen aided and abetted Kang's violations of §§ 17(a)(1) and 17(a)(3) of the Securities Act; and Count Four alleges that Paulsen aided and abetted Kang's violations of Section § 10(b) of the Securities Exchange Act and Rule 10b-5. (Id. ¶¶ 68-83)

The Complaint seeks an order (1) permanently enjoining Paulsen from violating or aiding and abetting violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5, and § 17(a) of the Securities Act; (2) directing Paulsen to disgorge the proceeds of his violations of these securities laws; and (3) directing Paulsen to pay civil penalties pursuant to Section 20 of the Securities Act and Section 21(d)(3) of the Securities Exchange Act. (Id. at 17)[5]

Paulsen moved to dismiss on November 24, 2018. (Dkt. No. 34) This Court denied Paulsen's motion in a February 13, 2019 bench ruling. (Dkt. No. 48)

Pending before the Court is the SEC's motion for summary judgment on all of its

---

[5] The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

7

claims. (Dkt. No. 72)

## DISCUSSION

### I. LEGAL STANDARDS

#### A. Summary Judgment

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).

In deciding a summary judgment motion, a court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alteration in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). "'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" Eviner v. Eng, No. 13 Civ. 6940 (ERK), 2015 WL 4600541, at *6 (E.D.N.Y. July 29, 2015) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)).

B.     **Aiding and Abetting Liability**

To establish liability for aiding and abetting a violation of the securities laws, the SEC must show "'(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) "knowledge" of this violation on the part of the aider and abettor and (3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.'" SEC v. Yorkville Advisors, LLC, 305 F. Supp. 3d 486, 510 (S.D.N.Y. 2018) (quoting SEC v. DiBella, 587 F.3d 553, 566 (2d Cir. 2009)).

To establish knowledge, the SEC must show a "'defendant's general awareness of [his] overall role in the primary violator's illegal scheme.'" SEC v. Espuelas, 905 F. Supp. 2d 507, 518 (S.D.N.Y. 2012) (quoting SEC v. Apuzzo, 758 F.Supp.2d 136, 147 (D. Conn. 2010), rev'd on other grounds, 689 F.3d 204 (2d Cir. 2012)). "The Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences. Whether a given intent existed is generally a question of fact, appropriate for resolution by the trier of fact." Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 538 (2d Cir. 1999) (citations and quotations omitted); see also SEC v. Cole, 2015 WL 5737275, at *5 (S.D.N.Y. Sept. 19, 2015) ("[T]he Second Circuit has left no doubt that scienter issues are seldom appropriate for resolution at the summary judgment stage.").

To establish substantial assistance, the SEC must offer evidence that a defendant "'associated himself with the [illegal] venture, that he participated in it as something he wished to bring about, and that he sought by his action to make it succeed." Espuelas, 908 F.Supp.2d at 414 (quoting Apuzzo, 689 F.3d at 214). "[I]t is well-established in the Second Circuit that 'mere awareness and approval of [a] primary violation is insufficient to make out a claim for substantial assistance.'" SEC v. Tecumseh Holdings Corp., No. 03 Civ. 5490 (SAS), 2009 WL 4975263 (S.D.N.Y. Dec. 22, 2009) (quoting SEC v. Treadway, 430 F.Supp.2d 293, 339

9

(S.D.N.Y. 2006)).  The defendant must "'consciously assist[] the commission of the specific crime in some active way.'"  SEC v. Mudd, No. 11 CIV. 9202 (PAC), 2016 WL 815223, at *7 (S.D.N.Y. Feb. 29, 2016) (alteration in original) (quoting Apuzzo, 689 F.3d at 212 n.8).

The elements of knowledge and substantial assistance "'cannot be considered in isolation from one another.'"  Espuelas, 908 F.Supp.2d at 409 (quoting DiBella, 587 F.3d at 566).  "'[A] high degree of knowledge may lessen the SEC's burden in proving substantial assistance, just as a high degree of substantial assistance may lessen the SEC's burden in proving scienter.'"  Id. (quoting Apuzzo, 689 F.3d at 214).

## II. ANALYSIS

### A. Scienter

The SEC argues that Paulsen had a "general awareness" of his role in Kang and Kelley's illegal scheme because he (1) knew that the Fund's rules prohibited Kang from accepting gifts and entertainment from broker-dealers; (2) knew that the purpose of the ski trip was to entertain Kang, and decided to participate in the trip anyway; and (3) covered-up Kang and Kelley's scheme by submitting false expense reports and lying to investigators.  (Pltf. Br. (Dkt. No. 74) at 24)

A scheme to provide gifts and entertainment to a pension fund executive in violation of the pension fund's policies and a broker-dealer's policies does not in itself constitute securities fraud, however.  In demonstrating that Paulsen provided "substantial assistance" to Kang and Kelley's illegal scheme, the SEC must proffer evidence that Paulsen knew that, or acted in reckless disregard of whether, Kelley was providing gifts and entertainment to Kang in exchange for Kang directing Fund trades to Sterne Agee.  And in order to prevail on its summary judgment motion, the SEC must demonstrate that there is no material issue of fact as to Paulsen's knowledge and his intent to associate himself with the illegal venture, and to participate in it as

something he wished to bring about and help succeed. Espuelas, 908 F.Supp.2d at 414.

In attempting to meet this standard, the SEC cites Paulsen's post-trip cover-up of Kelley's and his own expenditures regarding Kang, and "[t]he undisputed evidence that Paulsen mentioned an energy trade Sterne Agee executed for the Fund in the middle of his discussion with Kelley [about] falsifying their expense reports." According to the SEC, Paulsen's mention of this trade "demonstrates that [he] was aware that Kang was directing trades to Sterne Agee in exchange for being entertained on the ski trip." (Pltf. Br. (Dkt. No. 74) at 25-26)

In response, Paulsen concedes that he generally understood that clients were offered entertainment with "a hope that . . . [they] might be favorably inclined towards Sterne Agee when conducting future trades." (Def. Opp. Br. (Dkt. No. 77) at 25) But Paulsen contends that he "had no reason to suspect that this isolated instance of entertainment was part of an illicit bribery or kickback arrangement between Kelley and Kang." (Id. at 26) "At worst, the evidence suggests that Paulsen was aware that by treating Kang to meals and other entertainment on the ski trip, Kelley was facilitating Kang's violation of the Fund's rules, and thus violating Sterne Agee's internal policies." (Id. at 26) And Paulsen denies knowing that Kang – as opposed to another Fund employee – had directed the February 25, 2015 energy trade to Sterne Agee. (Pltf. R. 56.1 Stmt. (Dkt. No. 73) ¶¶ 98-100; Def. R 56.1 Cntrstmt. (Dkt. No. 86) ¶ 98)

In sum, the SEC asks this Court to rule, as a matter of law, that because Paulsen was (1) aware that the gifts and entertainment provided to Kang in connection with the ski trip violated Fund and Sterne Agee policies; (2) actively covered-up the improper entertainment of Kang at Kelley's request; and (3) mentioned the ski trip to a Sterne Agee colleague who had alluded to a trade Kelley had performed for the Fund, Paulsen must have been aware that Kelley and Kang had entered into a quid pro quo arrangement in which Kang provided Fund business to

11

Kelley in exchange for gifts and entertainment. But Paulsen has offered another explanation for his actions.

Paulsen asserts that he acted as he did because he was friendly with Kelley and Kang and did not want either to face discipline from their respective employers as a result of the ski trip. (Def. Opp. Br. (Dkt. No. 77) at 28) There is evidence in the record that supports this assertion. For example, Kang had had business dealings "with Paulsen years before when Kang was a fixed income trader with a prominent asset manager." After joining the Fund, Kang told Kelley that he "wanted to use Paulsen as a resource." (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 165-66) And when Paulsen reconnected with Kang in February 2014, he invited Kang to go skiing in Windham, New York, where Paulsen had a cabin. (Id. ¶¶ 170, 211) As to Kelley, she invited him on the Park City ski trip, and it is obvious from their communications that they shared a cordial relationship.

Paulsen was well aware that both Kang and Kelley could face discipline if the details of the Park City ski trip were disclosed. Paulsen knew that, pursuant to Fund and Sterne Agee policies, Kang was prohibited from receiving gifts and entertainment from Sterne Agee employees. (Id. ¶ 169) And at his deposition, Paulsen testified that when he spoke with Kelley after her interview, she expressed concern that "word of the internal investigation could get to the State of New York and it could cause [Kang] trouble in terms of his employer." (Id. ¶ 287) Kelley asked Paulsen to "tell a story that was consistent with hers[,]" and – according to Paulsen – he agreed to do so "because he wanted to protect Kelley and Kang." (Id. ¶¶ 288-89) Paulsen also testified that he thought Sterne Agee's investigation of the ski trip "was simply some kind of internal compliance thing at Sterne Agee." (Id. ¶ 290)

While the SEC argues that this evidence "supports the conclusion that Paulsen . . .

12

was reckless in not knowing that Kang and Kelley were violating the securities laws" (Pltf. Reply Br. (Dkt. No. 84) at 10), the Commission acknowledges that there is no evidence "that Kelley specifically told Paulsen about the flow of fixed income trades Kang was sending to Sterne Agee in exchange for entertainment." (Id. at 11)  The SEC asks, however, "what else could Paulsen have thought was going on?  There is no legitimate reason to lavish Kang with meals and then lie about it."  (Id. at 11)

The question posited by the SEC implicates issues of Paulsen's knowledge and intent, and the inferences that should be drawn from the evidence.  Such issues are for juries, not for judges, and are not susceptible to resolution at summary judgment.  See Cole, 2015 WL 5737275, at *5 ("[S]cienter issues are seldom appropriate for resolution at the summary judgment stage."); Press, 166 F.3d at 538 ("Whether a given intent existed is generally a question of fact, appropriate for resolution by the trier of fact.").  While the SEC contends that Paulsen acted to cover-up Kang and Kelley's primary violation of the securities laws, or acted in reckless disregard of whether they were violating the securities laws, Paulsen contends that he acted merely to protect Kang and Kelley from discipline by their respective employers, and without any knowledge or reason to suspect that they had entered into a quid pro quo arrangement that violates the securities laws.  The dispute between the parties cannot be resolved as a matter of law by this Court.

Paulsen's conduct in submitting a false expense report and in lying to those investigating the ski trip is equivocal for reasons already discussed.  And – contrary to the SEC's argument – Paulsen's instant message exchange with Kelley about the energy trade does not establish "that Paulsen was aware that Kang was directing trades to Sterne Agee in exchange for being entertained on the ski trip."  (Pltf. Br. (Dkt. No. 74) at 26)

As an initial matter, Paulsen contends that he "knew that the Fund was trading with Sterne Agee long before the ski trip." (Def. Br. (Dkt. No. 77) at 30) Indeed, when Paulsen met Kang in February 2014, "[t]hey discussed Kang's new position at the Fund and the potential for the Fund to do more business with Sterne Agee." (Def. R. 56 Stmt. (Dkt. No. 86) ¶ 167) Paulsen testified that his "understanding[, at the time,] was that the Fund was an existing client of Sterne Agee and that Sterne Agee was approved to serve as a counterparty to execute trades with the Fund." (Id. ¶ 168) Paulsen's alleged understanding that the Fund had an existing relationship with Sterne Agee, and was executing trades for the Fund prior to the ski trip, obviously undermines the notion that he must have understood that Kang and Kelley had entered into an illicit quid pro quo arrangement.

Paulsen's exchange with Oppici – the Sterne Agee colleague with whom Paulsen discussed Kelley's energy trade and the ski trip – is also equivocal. Oppici does not recall Paulsen "telling him to 'stay quiet' about the ski trip, . . . [or] any sensitivity about discussing the ski trip." (Def. R. 56 Stmt. (Dkt. No. 86) ¶ 276) Arguably, the fact that Paulsen disclosed the ski trip to Oppici suggests that he did not believe that Kelley and Kang were engaged in illegal conduct. And while Paulsen apologized to Kelley for disclosing the ski trip to Oppici, and told her that he had asked Oppici to "stay quiet" about the trip, this conduct could reflect an attempt by Paulsen to assuage Kelley's concerns rather than a concern on Paulsen's part that Kang and Kelley were engaged in illegal conduct.

Paulsen's decision to go on the ski trip also does not demonstrate that he understood that Kang and Kelley had entered into an illegal quid pro quo arrangement. Paulsen asserts that he "was interested in attending the trip because he liked to ski, and because it was consistent with his role as an analyst to support Kelley in the development of client

14

relationships." (Id. ¶ 229) The Court concludes that a reasonable juror could find that Paulsen (1) went on the ski trip because he enjoyed skiing, and (2) did not view the ski trip as part of an illegal exchange by which Kelley offered Kang gifts and entertainment in exchange for Kang steering Fund trades to Sterne Agee, but rather as a vehicle to strengthen the firm's already existing relationship with the Fund and Kang. Given this Circuit's "lenien[cy] in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences[,]" the energy trade discussion and Paulsen's instant message exchange with Kelley are not sufficient to demonstrate his scienter as a matter of law. See Press, 166 F.3d at 538.[6]

Finally, the SEC has submitted supplemental briefing concerning conversations between Paulsen and Donald Jones, a Sterne Agee research analyst. (Pltf. Supp. Br. (Dkt. No. 92) at 1) Paulsen told Jones "not to say anything to anyone" about the ski trip because Kang "will be fired on the spot . . . ." (Id.) The SEC contends that Paulsen's instruction to Jones constitutes "additional undisputed evidence . . . in support of the conclusion that Paulsen knew, or was reckless in not knowing, of Kelley's and Kang's securities law violations." (Id. at 2) While Paulsen's instruction to Jones could be viewed as more evidence of a cover-up, it does not demonstrate that Paulsen was aware that, or acted in reckless disregard of whether, Kang and Kelley were engaged in an illegal quid pro quo arrangement.

---

[6] The SEC also argues that "Kang's and Kelley's failure to disclose the entertainment created a material conflict of interest, and therefore a primary securities law violation, even if Kang had not been successful in steering trades to Sterne Agee in exchange." (Pltf. Br. (Dkt. No. 74) at 26) "Therefore, [the SEC] need not establish Paulsen's awareness of every trade Kang steered to Sterne Agee to succeed on its motion for summary judgment." (Id. at 27) The Commission concedes, however, that for Paulsen to be liable on a conflict of interest theory, there must be proof that he knew that Kang was attempting to steer Fund trades to Sterne Agee "in exchange" for gifts and entertainment. The SEC has not proffered evidence beyond that already discussed suggesting that Paulsen was aware that Kang was attempting to steer Fund trades to Sterne Agee "in exchange" for gifts and entertainment.

## **CONCLUSION**

Because there are material issues of fact as to whether Paulsen acted with scienter, the SEC's motion for summary judgment is denied. The Clerk of Court is directed to terminate Dkt. Nos. 72 and 83.

This matter will proceed to trial on **July 13, 2020**. The joint pretrial order, motions in limine, requested voir dire, and requests to charge are due on **June 15, 2020**. Responsive papers are due **June 22, 2020**. The parties are directed to consult this Court's Individual Rules as to the contents of these materials.

Dated:  New York, New York
       April 18, 2020

SO ORDERED.

*Paul G. Gardephe*

Paul G. Gardephe
United States District Judge