UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                         Plaintiff,

         v.

JOHN A. PAULSEN,

                         Defendant.

**MEMORANDUM
OPINION & ORDER**

18 Civ. 6718 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Securities and Exchange Commission (the "SEC") brings this civil

enforcement action against Defendant John Paulsen for aiding and abetting violations of the

securities laws.

        The Complaint was filed on July 27, 2018.  (Dkt. No. 1)  Count One alleges that

Paulsen aided and abetted Deborah Kelley's violations of Sections 17(a)(1) and 17(a)(3) of the

Securities Act; Count Two alleges that Paulsen aided and abetted Kelley's violations of Section

10(b) of the Securities Exchange Act and Rule 10b-5; Count Three alleges that Paulsen aided

and abetted Navnoor Kang's violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act;

and Count Four alleges that Paulsen aided and abetted Kang's violations of Section 10(b) of the

Securities Exchange Act and Rule 10b-5.  (Id. ¶¶ 68-83)

        The Complaint seeks an order (1) permanently enjoining Paulsen from violating

or aiding and abetting violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5,

and Section 17(a) of the Securities Act; and (2) directing Paulsen to pay civil penalties pursuant

to Section 20 of the Securities Act and Section 21(d)(3) of the Securities Exchange Act.[1]  (Id. at

17)[2]

Paulsen moved to dismiss on November 24, 2018.  (Dkt. No. 34)  This Court

denied Paulsen's motion in a February 13, 2019 bench ruling.  (Dkt. No. 48)  The SEC moved

for summary judgment on July 22, 2019.  (Dkt. No. 72)  This Court denied the SEC's motion on

April 18, 2020.  (Dkt. No. 98)

On May 20, 2020, the parties waived their right to a jury trial.  (Dkt. No. 99)

In a July 14, 2020 conference, this Court ruled on the parties' motions in limine

(Dkt. Nos. 107, 115), and on July 15, 2020, the case proceeded to trial.[3]  After closing arguments

on July 17, 2020, the parties filed post-trial briefing, which was fully submitted as of August 28,

2020.  (Dkt. Nos. 148-155)

This memorandum opinion constitutes the Court's findings of fact and

conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

### A.      Paulsen, Kelley, and Kang's Employment and Relationship

1.  Between June 5, 2013 and March 30, 2015, Paulsen was a managing director in the New

York City office of Sterne Agee & Leach, Inc. ("Sterne Agee"),[4] a registered broker-dealer

---

[1]  The SEC has withdrawn its claim for disgorgement.  (SEC Br. (Dkt. No. 148) at 43 n.8)
[2]  The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.
[3]  Pursuant to the parties' stipulation, this Court conducted the bench trial remotely, using the Skype for Business platform.  (Dkt. No. 103)
[4]  On June 5, 2015, Stifel Financial Corporation, the parent company of registered broker-dealer Stifel Nicolaus & Company, acquired Sterne Agee.  On July 1, 2016, Stifel Financial sold Sterne Agee, and Sterne Agee has not been registered as a broker-dealer since approximately July 1, 2017.  (Joint Stipulation of Fact (Dkt. No. 108-1) ¶ 7)  In discussing events during the time period that Stifel Financial owned Sterne Agee, this Court refers to the combined entity as "Sterne Agee."

with headquarters in Birmingham, Alabama.  Paulsen worked as a research analyst in Sterne Agee's Fixed Income Investment Grade group, covering foreign banks and certain non-bank financial institutions.  He managed two other analysts.  (DX TT (Paulsen Decl.) ¶ 4)

2. Paulsen provided credit research support to Sterne Agee's traders, clients, and salespeople – including Kelley – and often met directly with Sterne Agee clients to discuss the sectors he covered.  (Id. ¶ 5)

3. Paulsen had 30 years' experience in the financial services sector when he joined Sterne Agee. After leaving Sterne Agee, Paulsen worked as head of research for Stonebridge Advisors, LLC, a registered investment advisor in Wilton, Connecticut, holding that position from April 13, 2015 to August 8, 2018.  He has been unemployed since that time.  (PX 85 (Paulsen CV) at 14-17; DX TT (Paulsen Decl.) ¶ 2)

4. Paulsen's compensation at Sterne Agee included a base salary, a discretionary bonus, and five percent of trading profits generated from a portfolio traded by Sterne Agee trader John Price.  The discretionary bonus was based on a number of factors, including Sterne Agee's overall profitability, the profitability of the Investment Grade Fixed Income group, and Paulsen's individual performance, which was evaluated in terms of the quality of his research and the service he provided to Sterne Agee salespeople, traders, and clients.  (DX TT (Paulsen Decl.) ¶¶ 6-7)

5. Deborah Kelley was a registered sales representative at Sterne Agee from January 2012 through August 2015.  In that capacity, she worked with Paulsen and other Sterne Agee research analysts.  As part of her job, Kelley entertained Sterne Agee clients.  Her compensation was based on commissions generated by her clients' trades.  (PX 14 (Kelley Decl.) ¶¶ 2-7)

6.  Navnoor Kang joined the New York State Common Retirement Fund (the "Fund") in
    January 2014 as a Senior Investment Officer, and was promoted to Director of Fixed Income
    and Head Portfolio Strategist shortly thereafter.  In that role, he was responsible for
    managing the approximately $50 billion of Fund assets held in fixed-income securities.
    Kang worked at the Fund until his employment was terminated in February 2016.  (PX 10
    (Kang Decl.) ¶¶ 6-8, 40)

7.  Kang and Kelley met at some point between 2007 and 2009.  Kang was then a Senior
    Portfolio Management Associate with Pacific Investment Management Company, LLC,
    while Kelley was a sales representative at BNP Paribas.  Their business relationship
    continued when Kang became Vice President and Fixed Income Portfolio Manager/Trader at
    Guggenheim Partners Asset Management.  Kelley and Kang's business relationship
    eventually became a friendship.  Kelley helped Kang with his job search after he was fired by
    Guggenheim Partners for accepting expensive tickets to a Rolling Stones concert from a
    Jeffries sales person.  Kelley recommended Kang for the position he ultimately obtained at
    the Fund.  After Kang was hired by the Fund, Kelley serviced the Fund for Sterne Agee.  (Id.
    ¶¶ 14-15, 17; PX 14 (Kelley Decl.) ¶¶ 8-12; Trial Tr. at 62:8-24, 87:4-91:23; PX 11 (Kang
    Dep.) at 31:2-32:11)

8.  Paulsen met Kang at some point between 2010 and 2013, and the two had occasional
    business interactions between that time and Kang's arrival at the Fund.  Kang considered
    Paulsen to be a very good research analyst.  (PX 10 (Kang Decl.) ¶¶ 17-18)

**B.      The Fund's Gifts and Entertainment Policy and
          Sterne Agee's Policies Regarding Client Entertainment**

9.  Under New York law, the New York State Comptroller is a fiduciary of the Fund.  Anyone
    to whom the Comptroller delegates powers of investment at the Fund is likewise a Fund

4

fiduciary.  Kang, who was delegated powers of investment by the Comptroller, was thus a Fund fiduciary.  Under New York law and the Fund's Code of Conduct, Kang – as a Fund fiduciary – was prohibited from receiving any consideration, including gifts and entertainment, from any party other than the Office of the State Comptroller in connection with a Fund transaction.  (11 N.Y.C.R.R. § 136-2.3; PX 43 (Code of Conduct for the Fund); PX 10 (Kang Decl.) ¶ 9)

10. Kang received training concerning the Fund's Code of Conduct, other Fund policies, and relevant provisions of New York law, and he knew that he was not allowed to accept gifts, travel, meals, or entertainment valued at more than $15.  Kang was also aware that he was obligated to disclose to the Fund any solicitation to accept, or acceptance of, gifts or entertainment.  (PX 10 (Kang Decl.) ¶¶ 11-13)

11. Each year, all Sterne Agee employees were required to complete an online compliance questionnaire, in which they certified their understanding that they "must fully abide by all [gifts and entertainment] restrictions [the employee is] made aware of internally or by the client/counterparty."  Kelley and Paulsen each completed this questionnaire in December 2014.  (PX 52 (Paulsen 2014 Sterne Agee Compliance Questionnaire) § 16; PX 52.1 (Kelley 2014 Sterne Agee Compliance Questionnaire) § 16)

12. Sterne Agee encouraged salespeople such as Kelley and analysts such as Paulsen to engage in client entertainment, and the firm's Travel and Entertainment Policy states that "[e]ntertainment is a customary and important part of a business relationship."  (DX YY (Sterne Agee Travel and Entertainment Policy) at 3)

13. Andrew Rochat, the head of Sterne Agee's investment grade corporate bond division, regards salespeople as the "point person for any of this relationship building," with analysts in a

support role.  Kelley understood that the firm encouraged her to entertain clients.  She likewise understood that her compensation was based on commissions generated from trades by her clients.  Paulsen understood that the firm encouraged analysts to meet with clients on their own.  According to Paulsen's supervisor, Scott Shiffman, Paulsen was "the most active [member of his] team at meeting with clients in person."  (DX DDD (Rochat Dep.) at 63:2-15; PX 14 (Kelley Decl.) ¶¶ 4-6; DX TT (Paulsen Decl.) ¶ 11; PX 19 (Shiffman Decl.) ¶ 8)

14.  Kelley knew that Kang, as a Fund employee, was prohibited from receiving gifts and entertainment from Sterne Agee.  Kelley learned about this restriction in connection with Kang's August 2014 request that she purchase concert tickets for him.  (PX 14 (Kelley Decl.) ¶ 15; Trial Tr. at 117:2-17)

15.  In an August 14, 2014 instant message, Kelley told Kang that she was attending a Paul McCartney concert in San Francisco that evening.  The next day, Kelley messaged Kang that she had enjoyed the concert, and that she was "thinking [she] might want to see him again.  I could rendezvous."  Kang responded, "that could be a lot of fun."  In a subsequent telephone conversation, Kang told Kelley, "it would be fun, we could go together."  Kelley understood that Kang was asking her to take him to the concert.  She testified that she was "shocked" by Kang's request, because she "had never had a client ask [her] to take them to an event before."  (Trial Tr. at 121:4-123:20, 153:17-154:1)

16.  In October 2014, Kelley and Kang attended a Paul McCartney concert in New Orleans. Kelley purchased two tickets for Kang, and also paid for meals and entertainment for Kang and his girlfriend – Sherene Chou – during the trip.  Kang told Kelley that his name could not appear on an expense report, because the Fund prohibited him from accepting gifts and entertainment.  Accordingly, Kelley did not list Kang on her expense report for this trip,

although she expensed $6,005 for the concert tickets and more than $2,000 for meals and

other entertainment for herself, her husband, Kang, and Chou.  (PX 14 (Kelley Decl.) ¶¶ 15,

24-26; PX 15 (Kelley Dep.) at 62:1-18; PX 53 (Kelley Sept. 3, 2014 Expense Report) at 1;

PX 54 (Kelley Oct. 24, 2014 Expense Report); Trial Tr. at 117:2-17)

17. Paulsen knew that the Fund prohibited Kang from accepting gifts and entertainment, because

Kang informed Paulsen of this restriction in February 2014.  Paulsen was also aware at this

time that Sterne Agee was executing trades for the Fund.  (PX 8 (Paulsen Dep.) at 66:5-

67:11; Trial Tr. at 298:5-24, 300:24-301:5)

**C.      Background for the February 2015 Ski Trip**

18. Soon after Kang joined the Fund in January 2014, Kelley asked Sterne Agee to assign her to

cover the Fund's account.  Sterne Agee approved Kelley's request on February 5, 2014.

Kelley informed Paulsen that Kang had joined the Fund and was interested in Paulsen's

opinion on a potential trade involving securities of the Development Bank of Singapore (the

"Bank").  Paulsen provided Kang with credit information concerning the Bank, and Kelley

later told Paulsen that he "did a great job" and that Kang had used Sterne Agee to execute the

trade.  (PX 58 (Feb. 5, 2014 email from Walker to Kelley); DX TT (Paulsen Decl.) ¶¶ 18-19)

19. Paulsen later suggested to Kelley that he schedule a meeting with Kang at his office in

Albany, explaining that his ski cabin in Windham, New York was close to Albany.  Kelley

encouraged Paulsen to seek out a meeting with Kang.  In February 2014, Paulsen and Kang

met in the lobby of an Albany-area hotel where Kang was attending a conference, and the

two discussed the fixed income market.  During this meeting, Kang informed Paulsen of the

Fund's rules prohibiting him from accepting gifts and entertainment.  Paulsen mentioned that

his ski cabin was nearby and suggested to Kang that they could go skiing together.  Paulsen

reported this conversation to Kelley, including his suggesting to Kang that they could ski together.  (Id. ¶¶ 38-42)

20. In October 2014, Kelley proposed a client ski trip to her supervisor, Jon Walker – who was head of Fixed Income Sales at Sterne Agee – and to Andrew Rochat, head of Sterne Agee's Investment-Grade Corporate Bond Trading Desk.  Kelley offered to investigate expenses and hotel availability, and suggested Hotel Park City, in Park City, Utah, where BNP Paribas had hosted a ski trip in 2009.  Kelley invited a number of clients on the trip.  (DX P (Oct. 20, 2014 email from D. Kelley to A. Rochat and J. Walker); Trial Tr. at 127:5-128:16)

21. In a November 6, 2014 instant message to Kelley, Paulsen reminded Kelley that he and Kang had "talked about skiing this winter.  Need to do that."  Paulsen was referring to his February 2014 conversation with Kang, in which Paulsen had proposed skiing together in Windham. Kelley replied that she was "IN!  I'm his ski coach" and suggested Park City, telling Paulsen to "[p]ick a date" and she "will make it happen."  (PX 64 (Nov. 6, 2014 Instant Bloomberg between D. Kelley and J. Paulsen) at 2; Trial Tr. at 347:11-17)

22. On November 14, 2014, Kelley emailed Walker with cost estimates for the trip.  By December 19, 2014, Walker had approved the trip.  In an email that day, Kelley told Walker that she had booked the trip, and the next day Kelley informed Walker that Kang and his girlfriend – Sherene Chou – would join her in Park City.  (DX Z (Nov. 14, 2014, Dec. 19, 2014, and Dec. 20, 2014 emails from D. Kelley to J. Walker); PX 15 (Kelley Dep.) at 20:5-20; Trial Tr. at 134:10-12)

23. In a January 13, 2015 instant message, Paulsen asked Kelley for the name of the hotel in Park City, and to confirm that the dates of the trip would be Thursday, February 12, 2015 to Monday, February 16, 2015.  Kelley told Paulsen that Kang was not arriving until Friday

evening, and Paulsen asked if they "should do [F]riday to [Monday] . . . or just keep it :-)."
Kelley responded that she was "still coming in [on] Thurs[day]."  Paulsen also asked Kelley
about the price of the hotel; Kelley responded that the cost was $899 per night.  Paulsen
asked if Walker was "cool with that," and Kelley responded that he was.  Paulsen explained
that he "just want[ed] to make sure I will get reimbursed!"  Paulsen later told Kelley that
Hotel Park City was fully booked and that he would stay at another hotel, "lower budget but
fine for me and will be partying with you guys anyway."  (PX 65 (Jan. 13, 2015 Instant
Bloomberg between D. Kelley and J. Paulsen))

24. Paulsen booked travel from Monday, February 9, 2015 to Tuesday, February 17, 2015.  In
addition to Park City, Paulsen planned to see clients in Des Moines, Chicago, Denver,
Houston, San Francisco, and Vancouver.  (DX TT (Paulsen Decl.) ¶ 69)

25. In a February 3, 2015 instant message, Kelley told Paulsen that Kang and Chou were arriving
"late on Friday" and "will miss dinner and probably won't ski until half day on Saturday."
Paulsen replied, "we don't have to tell Sterne that!"  (PX 66 (Feb. 3, 2015 Instant Bloomberg
between D. Kelley and J. Paulsen) at 2)

26. Shortly before leaving on his trip, Paulsen told Walker that Kang was the only client
expected to attend the Park City ski trip.  Paulsen asked Walker whether he would still be
reimbursed for his expenses, given that only one firm client would be present in Park City.
Walker told Paulsen that he could go on the trip, but told him "to keep it low key and not to
talk about it very much."  (DX TT (Paulsen Decl.) ¶¶ 70-72; Trial Tr. at 326:12-15)

27. At trial, Paulsen testified that, in entertaining Kang and in submitting his expenses for that
entertainment, he "relied on the fact that [Walker] had approved [the Park City ski trip] and
he was in charge of the business and he was the boss at Sterne Agee for this type of thing."

Paulsen also stated that he understood that "Walker had the authority to grant some kind of exception to Sterne's rules[.]"  This testimony is not credible.  Given his more than thirty years' experience in the highly regulated financial services industry, it is not plausible that Paulsen believed that Walker was authorized to override Sterne Agee's written policies regarding gifts and entertainment.  Moreover, while Paulsen testified that it wasn't "clear to [him] before the trip, that [Sterne Agee was] going to entertain Mr. Kang on the trip," this testimony is not credible given Paulsen's knowledge that Kelley had booked hotel rooms for both herself and Kang.  (Id. at 327:20-22, 350:5-7)

**D.    Events in Park City**

28. Kelley, her husband, and Paulsen arrived in Park City on Thursday, February 12, 2015, and the three ate dinner together, with Paulsen paying for the dinner.  Kang and Chou arrived in Park City on Friday, February 13, 2015.  (PX 14 (Kelley Decl.) ¶¶ 39-40; PX 57 (Feb. 19, 2015 Paulsen Expense Report) at 2)

29. On Saturday, February 14, 2015, Paulsen, Kelley, and Kelley's husband met Kang and Chou for lunch.  Paulsen paid for lunch.  The same group had dinner together that evening, for which Kelley paid.  On Sunday, February 15, 2015, Paulsen went skiing with Kelley's husband, while Kelley accompanied Kang and Chou on a ski lesson.  The five reconvened for dinner that evening, for which Kelley paid.  Kelley also paid for ski rentals, lessons, car service, and a hotel room for Kang and Chou.  (DX TT (Paulsen Decl.) ¶¶ 80-82; PX 8 (Paulsen Dep.) 120:3-121:13, 123:14-18; PX 56 (Feb. 19, 2015 Kelley Expense Report) at 2; PX 10 (Kang Decl.) ¶¶ 30-39; Trial Tr. at 227:19-228:12)

30. Paulsen left Park City on Monday morning, February 16, 2015, flying to Vancouver to see other clients.  (DX TT (Paulsen Decl.) ¶ 83)

31. Paulsen testified that his relationship with Kang was "overwhelmingly [] professional,"
    "although [they] had an enjoyable time on the ski trip together and [Paulsen] liked [Kang]."
    Paulsen also testified that he had "principally a business relationship" with Kelley.  While
    Paulsen "had more interaction with [Kelley] on a personal basis than [with] Mr. Kang" and
    considered her a "good friend[]," their contact was always business-related.  Paulsen also
    noted that he lived in New Jersey at the time, while Kelley lived in San Francisco.  (Trial Tr.
    at 315:17-317:9)

**E.    Events After the Park City Ski Trip**

32. At some point after the ski trip, Kelley told Paulsen not to include Kang's name on his
    expense report.  In his February 19, 2015 expense report, Paulsen sought reimbursement for
    his February 12, 2015 dinner with Kelley and her husband, which cost $363.43.  Paulsen
    falsely listed Garbuzov Yuri and Anderson Del of PIMCO as guests at the dinner.  Paulsen
    also expensed the February 14, 2015 lunch with Kelley, her husband, Kang, and Chou, which
    cost $124.81.  Paulsen listed himself and Kelley as attendees, omitted Kang, Chou, and
    Kelley's husband, and falsely listed Greg Shea of Denver Investment Advisors as a guest at
    the lunch.  According to Paulsen, during his employment at Sterne Agee, this was the only
    expense report in which he lied about the attendees.  (DX TT (Paulsen Decl.) ¶¶ 79-80; PX
    57 (Feb. 19, 2015 Paulsen Expense Report) at 2; PX 8 (Paulsen Dep.) at 129:4-14; Trial Tr.
    at 148:6-21; 297:13-19; 309:19-310:24)

33. Kelley also lied in her expense report about the ski trip attendees, omitting Kang and Chou
    and substituting other firm clients or acquaintances who were not present.  (PX 14 (Kelley
    Decl.) ¶ 50)

34. In Paulsen's expense report, he listed expenses of $1,505 for the ski trip.  In total, Kelley and Paulsen expensed $12,692 for the ski trip.  (PX 27 (Tushaus Decl.) ¶¶ 9-10)

35. Paulsen testified that he had been aware, before the trip, of the high cost of the Park City hotel rooms.  After the trip, Kelley told Paulsen that she had "hop[ed] that Kang would pay for his room when they checked out," but he did not.  When questioned at trial about the high cost of the entertainment provided to Kang, however, Paulsen denied any concern:  "I felt I was attending the trip at the request of Ms. Kelley who . . . had invited Mr. Kang. . . . I didn't expect to pay any of his expenses."  Paulsen also stated that he "felt comfortable because Ms. Kelley had said that it was approved and that Mr. Walker had approved it when I asked her about that.  And then I separately asked Mr. Walker if it was okay to go, and he said yes." The Court then asked, "[s]o what you're saying is that you didn't think you were in jeopardy and you really didn't care whether [Kang] was in jeopardy or not[,] [i]s that what you're saying?"  Paulsen answered, "[y]eah.  That's about it.  Yes."  (Trial Tr. at 302:11-303:24)

36. After Paulsen submitted his expense report, a Sterne Agee accountant asked him for documentation demonstrating that the ski trip had been pre-approved by management.  In a February 25, 2015 email, Paulsen asked Walker to confirm that the trip had been pre-approved.  In his email, Paulsen listed a number of clients and cities he had visited, including Salt Lake City, but did not mention the ski trip or Kang's presence in Park City.  Walker responded with his approval, which Paulsen forwarded to the accountant.  (PX 57 (Feb. 25, 2015 email from J. Paulsen to B. Vansant) at 6)

37. Paulsen initially testified that he "didn't think about" which clients to list in his February 25, 2015 email.  He instead "just put a select group of clients there because I knew that was what Jon would need to see."  Paulsen later conceded, however, that he intentionally "wouldn't

have included" the Fund on his list.  (Trial Tr. 323:21-324:16)  The fact that Paulsen intentionally omitted Kang from the pre-approved list demonstrates that Paulsen did not believe that Walker's pre-approval would override Sterne Agee's policies regarding gifts and entertainment.  If Paulsen truly believed that Walker could authorize a violation of the firm's gifts and entertainment policy, he would have been truthful in listing all of the clients he had entertained on his trip, including Kang.

38. On February 26, 2015, Kelley and Paulsen had the following instant message exchange:

> Kelley: Lo[o]se lips sink ships! No talky re ski trip si vous plait
>
> Paulsen: I have not said anything
>
> Kelley: Allen [Oppici] says he heard about it from you and that we were with Nav and "gorgeous" gf
>
> Paulsen: I mentioned to Allen yes. sorry
>
> Paulsen: Told him to stay quiet. He was talking about the energy trade you did yesterday
>
> Kelley: ah - xoxo - just need to be SO careful
>
> Paulsen: I know.
>
> Kelley: let's not mention to anyone else - AR, AO, and JW know.
>
> Paulsen: ok
>
> Paulsen: I put my expenses in and did not mention them
>
> . . . .
>
> Paulsen: for the [February 12, 2015] dinner at Mustang I put down Yuri and Del Anderson
>
> Paulsen: is that ok?
>
> Kelley: perf

(PX 67 (Feb. 26, 2015 Instant Bloomberg between D. Kelley and J. Paulsen))

39. The "energy trade" Paulsen referenced in this February 26, 2015 instant message exchange had taken place the previous day – February 25, 2015. On that day, Sterne Agee executed a trade on behalf of the Fund, purchasing Kinder Morgan bonds. The bonds were an energy sector investment, a part of the fixed income market not covered by Paulsen. Kelley earned a commission of $11,521 for this trade. (PX 14 (Kelley Decl.) ¶ 54; PX 22 (Jones Decl.) ¶ 3; PX 70 (Kelley trades for Fund between 12/5/2014 and 4/8/2015); PX 27 (Tushaus Decl.) ¶¶ 5, 11)

40. Kelley had invited Allen Oppici – a trader at Sterne Agee's New York office – to go on the ski trip. Oppici could not attend because of a family obligation. He was not aware at the time who else had been invited. Oppici recalled a brief conversation with Paulsen on February 26, 2015 about the ski trip, in which Paulsen told him that "[Kang's] girlfriend was there and she was hot." Oppici did not recall any discussion of the February 25, 2015 energy trade. (DX UU (Oppici Dep.) at 30:14-34:3, 42:11-43:8)

41. At trial, Paulsen testified that he "didn't know anything about [the February 25, 2015 energy trade] because [he did not] cover the energy sector." When asked why he thought Oppici had mentioned the energy trade to him, Paulsen testified that Oppici "must have known from Debbie I guess or someone that we had seen Kang on a ski trip, that we were skiing with him or whatever. And he mentioned that, and he brought it up." This testimony is not credible, given that in the contemporaneous instant message exchange with Kelley discussed above, Paulsen admits that he "mentioned [the trip] to [Oppici,] yes. [S]orry." (Trial Tr. at 327:23-328:9; PX 67 (Feb. 26, 2015 Instant Bloomberg between D. Kelley and J. Paulsen)

42. Paulsen also testified that he did not understand Kelley, in their instant message exchange, to be referencing any "relationship of the [energy] trade to the [ski] trip." But this claim is

likewise not credible.  The most plausible explanation for Paulsen mentioning the ski trip to

Oppici in connection with the energy trade is that Paulsen understood that there was in fact a

connection between Kang using Kelley to execute the energy trade and the ski trip, which

had taken place two weeks before.  (Trial Tr. at 328:2-16)

43. Paulsen also testified that he "told [] Oppici to stay quiet about the trip" because "Walker had

[] told [Paulsen] to . . . keep it low key."  However, when asked whether it was "pretty

obvious that something was very wrong," Paulsen replied "Not entirely.  Yes.  Yes."

Paulsen's direction to Oppici not to discuss the ski trip demonstrates that he understood, at

the time, that there was a connection between the energy trade and the ski trip, and that that

connection was not innocent or coincidental.  (Id. at 326:8-18)

44. Donald Jones – a research analyst who sat next to Paulsen and likewise provided advice to

the Fund – discussed the ski trip with Paulsen on February 26, 2015.  Paulsen told Jones "not

to say anything to anyone" about the ski trip, because Kang "will be fired on the spot" if his

attendance on the trip became known.  (PX 22 (Jones Decl.) ¶¶ 2, 4-5, 8)

45. Paulsen's discussion of the energy trade with Oppici in connection with the ski trip, and his

admonishment to Oppici and Jones not to discuss the ski trip with anyone, supports the

SEC's assertion that Paulsen understood that Kelley had provided the ski trip to Kang in

exchange for trading business from the Fund.

46. The evidence also supports the SEC's claim that the Funds' trading business through Kelley

increased significantly after Kelley took Kang on the ski trip.  Between February 1, 2014 –

when Sterne Agee became one of the Fund's approved brokers – and February 12, 2015 –

when Kelley and Paulsen left for the ski trip with Kang – Sterne Agee earned total gross

commissions of $325,423 from its trades on behalf of the Fund.  Between February 16, 2015

– the first trading date after the ski trip – and August 10, 2015 – the day Kelley's

employment at Sterne Agee was terminated – Sterne Agee earned total gross commissions of

$436,815 from its trades on behalf of the Fund.  Sterne Agee therefore earned approximately

$6,000 in weekly gross commissions in the approximately 54 weeks before the ski trip, and

approximately $17,500 in weekly gross commissions in the approximately 25 weeks after the

ski trip.  Stated another way, Sterne Agee's weekly commissions from the Fund increased

approximately nearly 200 percent after the ski trip.  Even assuming <u>arguendo</u> that there is

lower trading volume during the holiday period that preceded the ski trip, there was a

significant increase in Sterne Agee's trading on behalf of the Fund after the ski trip, which

suggests a <u>quid</u> <u>pro</u> <u>quo</u> relationship between the ski trap and the increased trading volume.[5]

(PX 27.1 (Tushaus Decl.) ¶ 6; PX 68.1 (Kelley Commissions); Trial Tr. at 96:4-97:17, 98:8-

98:23)

**F.**      **Sterne Agee's Internal Investigation**

47. In March 2015, Paulsen left Sterne Agee for a job at Stonebridge Advisors.  Soon thereafter,

Sterne Agee hired Morgan, Lewis & Bockius to investigate Kelley's expense reports.  Sterne

Agee suspected that Kelley might have provided gifts and entertainment to Kang in violation

of the firm's gifts and entertainment policy.  In late April 2015, Morgan Lewis attorneys

contacted Paulsen to arrange an interview.  Paulsen contacted Kelley and asked her about the

purpose of the investigation.  Kelley told Paulsen that the investigation involved the ski trip

---

[5]  Paulsen contends that "Sterne Agee's trading records do not identify which trades were
executed with the Fund prior to November 6, 2014, when Sterne Agee became an approved fixed
income broker for the Fund."  According to Paulsen, "in addition to Castle Oak, Great Pacific,
and Williams, there may have been other trades executed through other intermediary brokers."
(Paulsen Br. (Dkt. No. 153) at 25)  There is no evidence of additional trades during the year
preceding the ski trip, however, and this Court cannot rely on Paulsen's speculation that there
may have been additional trades.

and that Morgan Lewis had scheduled an interview with her.  The two agreed that Paulsen

would delay his interview until after Kelley's interview had taken place, so that Paulsen

could learn what the investigators had asked.  (DX TT (Paulsen Decl.) ¶¶ 2, 86-92; PX 14

(Kelley Decl.) ¶¶ 56-60; PX 26 (Baird Decl.) ¶¶ 3-4)

48. Morgan Lewis attorneys interviewed Kelley on April 29, 2015.  Kelley falsely told the

investigators that Kang and Chou had stayed at a friend's house in Park City, and not in the

second hotel room that she had booked.  According to Kelley, the second hotel room had

remained empty.  Kelley also told the investigators that she had only seen Kang on Sunday,

February 15, 2015; that Kang had reimbursed her for ski rentals and ski lessons by

purchasing drinks; that only she, her husband, Paulsen, and two friends from home attended

meals together; and that she had not purchased any meals for Kang or Chou.  (PX 14 (Kelley

Decl.) ¶¶ 60-66; PX 26 (Baird Decl.) ¶¶ 4-11)

49. After Kelley's interview, she reported to Paulsen what she had been asked and what she had

said.  Kelley told Paulsen that she was concerned that Kang could get into trouble with the

Fund, and that she could get into trouble with Sterne Agee, if the truth about the ski trip

became known.  Paulsen agreed that, when he was interviewed by the investigators, he would

tell a story that was consistent with Kelley's lies.  According to Kelley, it was "both of [their]

ideas" to lie to the Morgan Lewis lawyers about the ski trip.  (PX 14 (Kelley Decl.) ¶¶ 67-68;

DX TT (Paulsen Decl.) ¶¶ 2, 90-92; Trial Tr. at 170:7-10)

50. The Morgan Lewis lawyers interviewed Paulsen on May 4, 2015.  Paulsen repeatedly lied to

the investigators during the interview.  He told the investigators that he had not seen Kang

being entertained on the trip; that only he, Kelley, her husband, and two of Kelley's friends –

who were not Sterne Agee clients – had attended the February 14, 2015 lunch; that Kang was

in Park City independently and did not stay in the same hotel as Kelley; that he only saw

Kang on February 15, 2015, when Kang purchased food and drinks for Kelley, her husband,

and Paulsen; and that while he did not remember why Kang had insisted on paying for the

food and drinks, it may have been to offset something for which Kelley had paid earlier that

day.  (DX TT (Paulsen Decl.) ¶ 93; PX 26 (Baird Decl.) ¶¶ 13-22)

51. On August 10, 2015, Sterne Agee terminated Kelley's employment.  On February 22, 2016,

the Fund terminated Kang's employment.  (PX 14 (Kelley Decl.) ¶ 69; PX 10 (Kang Decl.) ¶

40)

52. At trial, Paulsen testified that he had lied to the investigators because he "didn't think that the

internal investigation was a big deal," and he "didn't know initially what the focus was."

Paulsen further explained that he "was concerned and [] Kelley was concerned that . . . Kang

[could get into] trouble with his employer if word were to get back that he had been

entertained."  (Trial Tr. at 311:18-312:2)

53. Paulsen's testimony that he did not understand, at the time, that it was a "big deal" that

Morgan Lewis had been hired to investigate his and Kelley's expense reports is not credible.

Paulsen conceded that in his entire thirty-year career in the financial services industry he had

never "been brought in and questioned by outside counsel about an expense report."  (Id. at

312:2-9)  Accordingly, Paulsen well understood, when he was interviewed by the Morgan

Lewis lawyers, that he was being interviewed about a significant matter that could have

serious consequences for everyone involved.  It was for this reason that he and Kelley

carefully planned and agreed on the lies that he would tell the investigators about the

entertainment of Kang.

54. Paulsen's testimony also indicates that it was critically important to him to cover up Kelley's and his entertainment of Kang.  According to Paulsen, he had never before lied on an expense report in this fashion.  He had never before fabricated attendees for a business lunch or dinner that he had expensed.  (Id. at 318:2-24)

55. Paulsen claimed at trial that he lied in order to protect Kang (id. at 311:18-312:2), but this assertion is likewise not credible.  Paulsen and Kang were not friends, and Paulsen testified that he "didn't care whether [Kang] was in jeopardy or not."  (id. at 303:20-24).  To the extent that Kelley was a close friend of Kang, and wanted to protect him, Paulsen had no such relationship with either Kang or Kelley.  Paulsen and Kelley never socialized outside of work-related activities, and his workplace was in New York City while her office was in San Francisco.  (Id. at 315:17-317:9)

56. The Court concludes that the only reasonable inference from the evidence is that Paulsen lied to protect himself.  He understood that Kelley and Kang had a quid pro quo relationship in which she provided gifts and entertainment to Kang in exchange for Fund business; that this relationship was illegal; and that given his own role in providing benefits to Kang, he could also be in jeopardy if he told the truth.  Although Paulsen claims that his primary concern was obtaining reimbursement for his Park City expenses (id. at 309:8-12), he was no longer employed by Sterne Agee when he was interviewed by the Morgan Lewis lawyers. Accordingly, his lies to them were not motivated by concerns about expense reimbursement. Instead, Paulsen lied because he understood that Kang and Kelley were engaged in an illegal quid pro quo relationship, and that his involvement in the Park City trip presented some risk to him.

**G.    The Prosecution of Kang and Kelley**

57. On December 19, 2016, Kang and Kelley were charged with conspiracy to commit securities

fraud, securities fraud, conspiracy to commit honest services wire fraud, honest services wire

fraud, and conspiracy to obstruct justice.  (United States v. Kang, No. 1:16-cr-837 (JPO)

(S.D.N.Y.), Indictment (Dkt. No. 1))

58. On May 30, 2017, Kelley pleaded guilty to conspiracy to commit securities fraud and honest

services wire fraud.  In her allocution, Kelley stated that she "paid for Kang to attend the

Park City ski trip with the hope of strengthening [her] business relationship with the Fund."

(PX 14 (Kelley Decl.) ¶¶ 73, 75)

59. On August 29, 2017, Kelley was sentenced to three years' probation with six months' home

confinement.  The court also imposed a $50,000 fine, restitution of $242,724.17, and

forfeiture of $187,991.19.  (PX 41 (Kelley Judgment); PX 14 (Kelley Decl.) ¶ 76)

60. At trial, Kelley's testimony about her relationship with Kang was somewhat equivocal.  She

at first suggested that there was no relationship between the entertainment that she provided

to Kang and the trading business he sent to Sterne Agee:

> Defense Counsel:  Did you ever have an understanding that you needed to
> entertain Mr. Kang in order for him to send you business?
>
> Kelley:  No.
>
> Defense Counsel:  Or that if you entertained Mr. Kang, he'd give you business in
> return?
>
> Kelley:  No.

(Trial Tr. at 111:10-14)

61. Kelley later testified, however, that she had provided Kang with gifts and entertainment "[t]o

improve the business relationship, which would generate more trades for [her]self and Sterne

Agee, more revenue -- more compensation for [her] and more revenue for Sterne."  Kelley

likewise conceded that she had "covered up the fact that [Kang] was [at Park City] by putting other people's names on the expense reports." Kelley, like Paulsen, testified that she had never before submitted fabricated expense reports of this sort. (Id. at 163:3-22)

62. To the extent that Kelley testified at trial that she was not trading entertainment for business, her testimony is not credible in light of her guilty plea; her testimony concerning her purpose in entertaining Kang; and her earlier dealings with Kang, in which he had demanded expensive entertainment from her.

63. In an August 14, 2014 instant message, Kelley told Kang that she was attending a Paul McCartney concert in San Francisco that evening. The next day, Kelley messaged Kang that she had enjoyed the concert, and that she was "thinking [she] might want to see him again. I could rendezvous." Kang responded, "that could be a lot of fun." In a subsequent telephone conversation, Kang told Kelley, "it would be fun, we could go together." Kelley understood that Kang was asking her to take him to the concert. She testified that she was "shocked" by Kang's request, because she "had never had a client ask [her] to take them to an event before." (Trial Tr. at 121:4-123:20, 153:21-154:1)

64. Accordingly, and contrary to Kelley's trial testimony, she understood that Kang was in fact demanding gifts and entertainment from her in exchange for trading business. She also understood that an exchange of this sort was illegal. It was for this reason that she submitted false and fabricated expense reports and lied to investigators when confronted with those expense reports.

65. On November 8, 2017, Kang pleaded guilty to conspiracy to commit securities fraud and conspiracy to commit honest services wire fraud. At trial, Kang acknowledged his plea allocution, in which he stated, "I agreed to accept, from . . . Kelley, gifts and benefits which

[she] believed [she was] giving to me in exchange for steering fixed income business from

the fund to [Sterne Agee]."  Kang also admitted that he "gave business from the Fund to

Kelley in exchange for the gifts and benefits."  (PX 10 (Kang Decl.) ¶¶ 46-47; Trial Tr. at

235:23-236:2)

66.  On July 12, 2018, Kang was sentenced to 21 months' imprisonment.  The court also imposed

restitution of $242,724.17, and forfeiture of $78,716.  (PX 10 (Kang Decl.) ¶ 48; PX 35

(Kang Judgment))

67.  At trial, Kang testified that he had pleaded guilty because of the "perception" that he had

accepted gifts and entertainment in exchange for Fund business.  According to Kang,

however, he had never intended to engage in any such quid pro quo behavior:

> Defense Counsel:  [I]n terms of Deborah Kelley and the [F]und, did you -- when
> you entered your plea, did you believe that you were steering business to Sterne
> Agee in exchange for entertainment that was provided to you?
>
> Kang:  No.  The whole thing was based on -- yeah, mistakes were made and there
> was a perception on my end that these could be perceived as, you know,
> something in exchange for fixed income business, and there was never any intent,
> from my side, of that.
>
> You know, I accepted responsibility for that perception, and I paid the price for it
> and, you know, took responsibility for it, and that's all I can say to that.  There
> was not a deal made with anybody that, hey, do this for me and I will do that for
> you.  But sometimes perception is enough and that's unfortunate, and I accepted
> that.

(Trial Tr. at 237:6-20)

68.  The Court probed Kang's testimony on this point:

> The Court:  So, Mr. Kang, are you telling me that Deborah Kelley's providing the
> Park City ski trip to you and your girlfriend, are you telling us that her providing
> that entertainment was completely irrelevant to your decisions to trade through
> Sterne Agee?  Is that what you're telling us?
>
> Kang:  Yes, Your Honor.  That's correct.  The two are not related, and although
> you can certainly draw a line between the two, there was nothing in my heart or
> mind that said if you do this, I will do this for you.  And that's it. . . .

> The Court:  And to put it another way, after the ski trip, when you authorized trades through Sterne Agee, the fact that you had received the Park City ski trip from Kelley, what you're telling us is that, that didn't affect your decision to trade through Sterne Agee whatsoever?
>
> Kang:  It did not. . . .

(Id. at 238:13-239:3)

69. Kang subsequently testified, however, that he was standing by his guilty plea allocution.  (Id. at 246:17-19)

70. Kang was not a credible witness.  Although he had admitted at his guilty plea allocution and in a declaration submitted in connection with the instant case that he and Kelley had a quid pro quo relationship in which she provided him with gifts and entertainment and he sent Fund trading business to Sterne Agee (PX 10 (Kang Decl.) ¶¶ 46-47; Trial Tr. at 235:23-236:2), he denied this quid pro quo relationship at trial, and falsely minimized his criminal culpability.  The Court concludes that Kang pled guilty because – as he said at the time (PX 10 (Kang Decl.) ¶¶ 46-47) – he was in fact guilty.

71. The Court also notes that Kang has a history of improperly demanding gifts and entertainment from vendors.  He was fired from Guggenheim Partners in February 2013 for accepting expensive Rolling Stones tickets from a broker.  Despite this experience, he demanded that Kelley purchase expensive Paul McCartney concert tickets for him in August 2014.  (PX 11 (Kang Dep.) at 31:2-32:11; Trial Tr. at 153:17-154:1)  Accordingly, the blatantly improper Park City ski trip was part of a pattern in which Kang engaged in corrupt "pay to play" activities.

## CONCLUSIONS OF LAW

As discussed above, the SEC contends that Paulsen aided and abetted Kang's and Kelley's violations of §§ 17(a)(1) and 17(a)(3) of the Securities Act and § 10(b) of the Securities Exchange Act.

To establish liability for aiding and abetting a violation of the securities laws, the SEC must show "'(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor and (3) substantial assistance by the aider and abettor in the achievement of the primary violation.'" SEC v. Yorkville Advisors, LLC, 305 F. Supp. 3d 486, 510 (S.D.N.Y. 2018) (quoting SEC v. DiBella, 587 F.3d 553, 566 (2d Cir. 2009)).

## I.      KELLEY AND KANG'S VIOLATIONS OF THE SECURITIES LAWS

Section 10(b) of the Exchange Act and Rule 10b-5 prohibit any person, in connection with the purchase or sale of any security, from directly or indirectly:  (1) "employ[ing] any device, scheme or artifice to defraud"; or (2) "engag[ing] in any act, practice, or course of business which operates . . . as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5.  Section 17(a) of the Securities Act similarly prohibits any person in the offer or sale of any security from, directly or indirectly:  (1) "employ[ing] any device, scheme or artifice to defraud"; or (2) "engag[ing] in any transaction, practice, or course of business which operates . . . as a fraud or deceit upon the purchaser."  15 U.S.C. § 77q(a).

"Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Securities Exchange Act and Rules 10b–5(a) and (c) thereunder create what courts have called 'scheme liability' for those who, with scienter, engage in deceitful conduct."  S.E.C. v. Jean-Pierre, No. 12 CIV. 8886 LGS, 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015).  To establish primary

violations of Sections 10(b) and 17(a) under a scheme liability theory, the SEC must prove that Kang and Kelley "'(1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud, (3) with scienter.'" SEC v. Sason, 433 F.Supp.3d 496, 508-09 (S.D.N.Y. 2020) (quoting SEC v. CKB168 Holdings, Ltd., 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016)).

Paulsen contends that here scheme liability "depends on a nexus between the undisclosed entertainment provided to Kang and Kang's steering trading business to Sterne Agee. And no such nexus is established within the meaning of Sections 10(b) and 17(a) unless Kang directed trades to Sterne Agee in exchange for the entertainment, or that Kelley provided entertainment to Kang in exchange for Kang steering Fund trading business to Sterne Agee." (Paulsen Br. (Dkt. No. 153) at 14 (emphasis in original))

Kelley's and Kang's judgments of conviction are prima facie evidence that they conspired to commit securities fraud. New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1081 (2d Cir. 1988). Moreover, the SEC has demonstrated, by a preponderance of the evidence, that both Kelley and Kang in fact conspired to commit securities fraud through a quid pro quo arrangement in which Kelley provided entertainment to Kang in exchange for Kang steering Fund business to Sterne Agee.

As to Kelley – for the reasons explained above – the Court concludes that she was knowingly engaged in a scheme with Kang to trade gifts and entertainment – such as the Paul McCartney concert tickets and the Park City ski trip – for Fund business. As Kelley testified, the reason she entertained Kang was to "do more business, to make more money" for both herself and for Sterne Agee. (Trial Tr. at 162:1-9)

Paulsen argues, however, that Kelley's testimony about her desire to "do more business, to make more money" is "consistent with her more detailed explanation about the purposes and goals of client entertainment," such that "she had no understanding or expectation based on any promise by Kang that he would direct trading to Sterne Agee in exchange for entertainment, or that there was a direct link between client entertainment and increased business."  (Paulsen Reply Br. (Dkt. No. 154) at 10-11)  Paulsen further argues that, "during [Kelley's] plea allocution, when Judge Oekten asked whether she understood at the time of her conduct that what she was doing was 'illegal,' Kelley responded no."  (Paulsen Br. (Dkt. No. 153) at 22)

While client entertainment may be a customary part of the sales process in the financial service industry, there was nothing customary about Kelley's entertainment of Kang. Kelley's entertainment of Kang was lavish, with more than $20,000 spent on the Paul McCartney concert tickets, related meals and entertainment, and the Park City ski trip.  (PX 53-55 (Kelley Expense Reports))  And Kelley spent this sum on Kang knowing that he was not allowed to accept gifts and entertainment, and that she was not permitted to offer him gifts and entertainment.  (Trial Tr. at 117:2-17)  And Kelley was well aware that Kang's demand for gifts and entertainment was improper.  She testified that she was "shocked" when Kang asked her to obtain the Paul McCartney concert tickets for him.  (Id. at 153:17-154:1)  Kelley entertained Kang in this manner with the expectation and understanding that he would direct more business to Sterne Agee in exchange for the benefits she was providing, and that is what he did.  And Kelley – knowing that this quid pro quo exchange was unlawful – covered it up by (1) submitting false and fabricated expense invoices; (2) ensuring that Paulsen would do the same;

and (3) concocting with Paulsen a false story of what happened in Park City when investigators approached her about the false and fabricated invoices.

As to Kang, primary securities fraud violations are established by (1) the judgment of conviction and his guilty plea allocution, in which he stated that he had "agreed to accept, from . . . Kelley, gifts and benefits which [she] believed [she was] giving to me in exchange for steering fixed income business from the fund to [Sterne Agee]"; and (2) his declaration, in which he stated that he "gave business from the Fund to Kelley in exchange for the gifts and benefits."  (Id. at 235:23-236:2; PX 10 (Kang Decl.) ¶ 47)

For the reasons discussed above, this Court rejects as not credible Kang's efforts at trial to minimize his criminal culpability.  As noted above, the Court concludes that Kang pleaded guilty because he was in fact guilty, and not because of the "perception issue" that he cited at trial.  (Trial Tr. at 237:6-20)

To the extent that Paulsen argues that a quid pro quo exists only "where a public official receives a payment in return for his or her promise to perform specific official acts" (Paulsen Reply Br. (Dkt. No. 154) at 11 (citing United States v. Silver, 948 F.3d 538, 549 (2d Cir. 2020)) (emphasis in Paulsen Reply Br.)), the law does not require an explicit promise.  As the Second Circuit stated in Silver, a "quid pro quo may be express or implied[.]"  Silver, 948 F.3d at 551.  And "[a] conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct."  United States v. Svoboda, 347 F.3d 471, 477 (2d Cir. 2003) (internal quotation marks and citation omitted).  As explained above, the evidence demonstrates that Kelley and Kang had a tacit understanding that she would supply him with gifts and entertainment in exchange for the Fund business he sent to Sterne Agee.

The Court concludes that the SEC has established, by a preponderance of the evidence, primary violations by Kelley and Kang.

## II.   PAULSEN'S KNOWLEDGE OF THE PRIMARY VIOLATIONS

To establish knowledge, the SEC must show a "'defendant's general awareness of [his] overall role in the primary violator's illegal scheme.'"  SEC v. Espuelas, 905 F. Supp. 2d 507, 518 (S.D.N.Y. 2012) (quoting SEC v. Apuzzo, 758 F.Supp.2d 136, 147 (D. Conn. 2010), rev'd on other grounds, 689 F.3d 204 (2d Cir. 2012)).  "[T]he defendant need not know all of the details of the crime . . . if the evidence shows that he joined the venture, shared in it, and that his efforts contributed towards its success."  United States v. Best, 219 F.3d 192, 199-200 (2d Cir. 2000) (internal quotation marks and citations omitted).  "[A] high degree of substantial assistance may lessen the SEC's burden in proving scienter."  S.E.C. v. Apuzzo, 689 F.3d 204, 215 (2d Cir. 2012).

Here, Paulsen knew that there was an illegal quid pro quo arrangement between Kang and Kelley, and feared that his involvement in the Park City trip might present a risk to him.  As discussed above, these conclusions flow directly from Paulsen's conduct, including his submission of a false and fabricated expense report for the first time in his thirty-year career, and his repeated lies at his first-ever meeting with outside counsel.  Paulsen's association of the ski trip with the February 25, 2015 energy trade – during his conversation with Oppici – and his direction to Oppici and Jones to "stay quiet" about the ski trip, demonstrate his understanding of the illegal quid pro quo relationship and his concern that he could be at risk.  In sum, the evidence demonstrates that Paulsen lied to protect himself.  It is not necessary for the SEC to demonstrate that Paulsen knew "all of the details of the crime."  Best, 219 F.3d at 199.  It is

sufficient that Paulsen's conduct and actions demonstrate that he was "general[ly] aware[]" of the quid pro quo and its illegality.  Espuelas, 905 F. Supp. 2d at 518.

Paulsen argues, however, that "the SEC must prove that Paulsen knew or had a reckless disregard for the primary violation as a whole.  It is insufficient to establish, without more, that Paulsen knew that he was participating in and assisting in concealing the provision of entertainment that was prohibited by the rules of the Fund or his employer."  (Paulsen Br. (Dkt. No. 153) at 31)  Paulsen further contends that "Sterne Agee had one general restriction on client entertainment, which essentially was that a client's entertainment policies should be honored. There was no training on the implications of violating a client's entertainment policies or about legal and regulatory considerations concerned with client entertainment."  (Id. at 32)

Paulsen's knowledge goes beyond his intentional flouting of Sterne Agee's gifts and entertainment policies and the Fund's rules prohibiting Kang from accepting gifts and entertainment, however.  He was aware that Kelley was providing gifts and entertainment to Kang in exchange for Fund business; knew that this conduct was improper and illegal; and was concerned that his own involvement in that conduct presented a risk to him.

Paulsen also argues that he "knew about the Fund executing trades with Sterne Agee from early on in Kang's tenure at the Fund," and did not view the ski trip "as an opportunity to entertain Kang in particular."  (Id. at 32-33)  Again, Paulsen's actions and conduct evince his knowledge that the ski trip was improper and illegal.  Indeed, by the time the ski trip was over, Paulsen concedes that he knew that something was "very wrong."  (Trial Tr. at 326:16-18)  He knew, for example, that Kang had not paid for his hotel room, and that Kelley had picked up the tab.  Because what had taken place was "very wrong," Kelley told Paulsen to keep quiet about the trip, and Paulsen repeated that instruction to Oppici and Jones.  (PX 67 (Feb. 26, 2015

Instant Bloomberg between D. Kelley and J. Paulsen))  In sum, Paulsen understood that Kang did not pay for his hotel room because he had an illegal quid pro quo arrangement with Kelley, and that because of this illegal arrangement it was necessary to "stay quiet" about the ski trip.

The Court concludes that Paulsen knew of Kelley and Kang's primary securities law violations.

III.   WHETHER PAULSEN SUBSTANTIALLY
       ASSISTED THE PRIMARY VIOLATIONS

To establish substantial assistance, the SEC must offer evidence that a defendant "associated himself with the [illegal] venture, that he participated in it as something he wished to bring about, and that he sought by his action to make it succeed." Apuzzo, 689 F.3d at 214.  "[I]t is well-established in the Second Circuit that 'mere awareness and approval of [a] primary violation is insufficient to make out a claim for substantial assistance.'" SEC v. Tecumseh Holdings Corp., No. 03 Civ. 5490 (SAS), 2009 WL 4975263 (S.D.N.Y. Dec. 22, 2009) (quoting SEC v. Treadway, 430 F.Supp.2d 293, 339 (S.D.N.Y. 2006)) (second alteration in Tecumseh). The defendant must "'consciously assist[] the commission of the specific crime in some active way.'" SEC v. Mudd, No. 11 CIV. 9202 (PAC), 2016 WL 815223, at *7 (S.D.N.Y. Feb. 29, 2016) (alteration in original) (quoting Apuzzo, 689 F.3d at 212 n.8).

The elements of knowledge and substantial assistance "'cannot be considered in isolation from one another.'" Espuelas, 908 F.Supp.2d at 409 (quoting DiBella, 587 F.3d at 566). "[A] high degree of knowledge may lessen the SEC's burden in proving substantial assistance, just as a high degree of substantial assistance may lessen the SEC's burden in proving scienter." Apuzzo, 689 F.3d at 214.

Here, Paulsen substantially assisted Kelley and Kang's illegal quid pro quo arrangement by:  (1) paying for Kang and his girlfriend's meal on the trip (DX TT (Paulsen

Decl.) ¶ 81); (2) agreeing with Kelley to submit false expense reports concerning the ski trip and then submitting false and fabricated expense reports (id. ¶ 84; PX 55 (Feb. 19, 2015 Paulsen Expense Report) at 2; Trial Tr. at 148:6-21; 297:13-19; 309:13-310:24); (3) agreeing with Kelley to "stay quiet" about the ski trip and instructing Oppici and Jones not to discuss the trip (PX 67 (Feb. 26, 2015 Instant Bloomberg between D. Kelley and J. Paulsen)); and (4) agreeing with Kelley to lie to the Morgan Lewis investigators, and thereafter repeatedly lying during his interview about what had taken place during the ski trip.  (DX TT (Paulsen Decl.) ¶ 93; PX 26 (Baird Decl.) ¶¶ 13-22)  Through these actions, Paulsen "consciously assisted" the primary violations in an "active way."  Mudd, 2016 WL 815223, at *7.

Paulsen argues, however, that "the SEC fails to establish any plausible reason for Paulsen seeking to perpetuate a 'pay to play' scheme from which he would not benefit." (Paulsen Reply Br. (Dkt. No. 154) at 15)  According to Paulsen, "Paulsen's mere presence on the trip and his false expense report omitting Kang's name from a single lunch is consistent with a willingness to provide improper entertainment to Kang and to avoid leaving any paper trail that might establish Kang's violation of his employer's rules."  (Id. at 15-16)  As discussed above, however, Paulsen's conduct cannot be explained by a desire to protect Kang and Kelley.  He had no close personal relationship with either Kang or Kelley.  Paulsen lied to protect himself. Paulsen understood that his involvement in Kang and Kelley's illegal quid pro quo arrangement presented a risk to Paulsen.

Finally, Paulsen argues that, "when the internal investigation began, any pay to play scheme had ended, thus making Paulsen, at most, an accomplice after the fact, not an aider and abettor."  (Id. at 16)  As discussed above, however, much of the substantial assistance Paulsen provided took place before the Morgan Lewis investigation was initiated.

The Court concludes that Paulsen substantially assisted Kelley and Kang's primary securities law violations.

<u>**CONCLUSION**</u>

For the reasons stated above, Paulsen is found liable for (1) aiding and abetting Kelley's violations of §§ 17(a)(1) and 17(a)(3) of the Securities Act (Count One); (2) aiding and abetting Kelley's violations of § 10(b) of the Securities Exchange Act and Rule 10b-5 (Count Two); (3) aiding and abetting Kang's violations of §§ 17(a)(1) and 17(a)(3) of the Securities Act (Count Three); and (4) aiding and abetting Kang's violations of § 10(b) of the Securities Exchange Act and Rule 10b-5 (Count Four).

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 107, 115).

By **November 9, 2020**, Paulsen will submit a brief addressing the SEC's arguments as to an appropriate civil monetary penalty.

Dated:  New York, New York
        October 23, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge